**UNITED STATES of America, Appellant,**

v.

**Alfred B. DIGGS.**

No. 75–1547.

United States Court of Appeals, Third Circuit.

Argued Oct. 2, 1975.

Reargued May 13, 1976.

Decided Aug. 27, 1976.

Sal Cognetti, Jr., Asst. U. S. Atty., Scranton, Pa., for appellant.

Wallace B. Eldridge, III, Cleckner & Fearen, Harrisburg, Pa., for appellee.

Argued Oct. 2, 1975.

Before MARIS, VAN DUSEN and HUNTER, Circuit Judges.

Reargued May 13, 1976.

Before SEITZ, Chief Judge, and MARIS, VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

OPINION

MARIS, Circuit Judge, with whom ALDISERT, ROSENN and WEIS, Circuit Judges, concur.

This is an appeal from an order of the district court holding unlawful under the

Fourth Amendment the action of two agents of the Federal Bureau of Investigation in taking possession of a locked metal box, opening the box and examining the contents, at the urging of the holder of the box, and suppressing the box and the $17,080 in United States currency which was found in it as evidence to be used in the defendant's trial for bank robbery. The district court's view was that the holder of the box, a gratuitous bailee, was not empowered to authorize the agents to open the box and that since they did so without obtaining a search warrant their action amounted to an unreasonable search and seizure in violation of the constitutional prohibition. The findings of the district court and the uncontradicted evidence as to matters not included in those findings but which we regard as significant disclose the following situation:

On Tuesday, January 14, 1975 three armed men robbed the National Central Bank in Harrisburg, Pennsylvania. Investigation by the FBI led to the arrest of the defendant, Diggs, on Monday, January 20th. He was thereafter indicted for his alleged participation in the robbery. After a mistrial, Diggs' renewed motion to suppress the box and its contents as evidence was granted by the court after a hearing. During the weekend after the robbery and before his arrest, Diggs and his common-law wife, Christine Mahone, visited Christine's uncle and aunt, the Rev. and Mrs. Andrew T. Bradley, at the home of the latter in New Bern, North Carolina. During this visit, Christine Mahone handed Mrs. Bradley a small metal box,[1] stating that it contained "stocks and bonds and silver paper and important papers that they had saved up for the children"[2] and she asked her to keep it for them "so they wouldn't be tempted to spend it." Mrs. Bradley then placed the box in her husband's bedroom closet. No key to the box or instructions concerning it were given to the Bradleys. They did not then know that it was locked and they attached no particular significance to it.

On January 20th, being concerned about the existing bad weather, Mr. Bradley telephoned his sister in Harrisburg and asked about his niece's safe return. During this conversation his sister told him of Diggs' arrest. Mr. Bradley then telephoned his niece and found her to be evasive inasmuch as she didn't disclose the fact that Diggs had been arrested until she was questioned and then described it as "some silly mess." Moreover, she told Mr. Bradley that she had been questioned by the FBI in Harrisburg and had told them of her visit to North Carolina and, in response to a specific question, had denied that she had left anything at the Bradleys' home. She stated further that the FBI would probably come to question him and that he should deny that they had left anything with the Bradleys.

The telephone conversation with the niece recalled to Mr. Bradley's mind the metal box which the niece had left with Mrs. Bradley, and from the conversation Mr. Bradley felt that "something was very much wrong" and he was pretty well convinced that Diggs and Christine Mahone "knew something or were involved in the bank robbery." The Bradleys became increasingly worried not only with regard to their niece's possible involvement in the robbery, but also with regard to their continuing to hold the box if it contained stolen property which should not be in their possession.[3] Their agitation increased during the two following days. Mr. Bradley felt that since his niece had lied to the FBI as to the box it was necessary to open it and find out just what was in it. This he felt he had

---

1. There was no evidence as to the actual ownership of the box and the court made no finding on the point. It does appear, however, that Diggs obtained the box from the automobile in which he and Christine Mahone had driven to New Bern and handed it to Christine who then, herself, handed it to Mrs. Bradley with the statement which we have quoted. It would, therefore, appear that Christine had a sufficient interest in the box to enable her to deal with it as a joint owner.

2. Transcript of Suppression Hearing, p. 75.

3. Transcript, pp. 31, 77, 78.

the right to do [4] but he wanted it done in the presence of witnesses. He consulted friends as to his problem and it was suggested that he contact the FBI. Finally, on the evening of January 23rd, he talked to his lawyer about it. The latter then called the local resident agent of the FBI, Agent Fanning, who in turn telephoned Mr. Bradley to make an appointment for the next day. However, Mr. Bradley said he did not want to wait but wanted to see the agent immediately about a bank robbery at Harrisburg.

Acceding to the insistent request of the obviously distraught Mr. Bradley, Agents Fanning and Shields came to the Bradley home about 12:30 A.M. on January 24th. Mr. Bradley related to them the facts and circumstances in which he was involved, and which we have already outlined. Agent Fanning then corroborated by telephone the fact of the January 14th robbery, the fact of Diggs' arrest, the fact that the stolen money had not yet been recovered, and the fact that Christine Mahone had not mentioned leaving any metal box in North Carolina. The agents then asked Mr. Bradley to get the box. He brought it from his bedroom closet and placed it on a coffee table in front of Agent Shields who picked it up and shook it. It was then discovered that it was locked. At this point Mr. Bradley informed the agents that neither Diggs nor Christine Mahone had left a key with him but he continued to insist that the box be opened in the agents' presence.

There was a United States magistrate domiciled in New Bern from whom a search warrant could have been obtained in approximately two hours. The agents had no reason to think that Mr. Bradley would open the box, conceal it or otherwise interfere with it if they decided to leave his house to obtain a search warrant. The district court found that Mr. Bradley would have been satisfied with the delay and he did at one point so testify. But later he appears to have clarified what he meant when he testified, "It wouldn't have satisfied me. But I would have had to go along with it." [5] Indeed, Mrs. Bradley testified that her husband had insisted that the agents come to their home that night "because he couldn't take it" any longer.[6]

While Agent Fanning was on the telephone attempting to locate a locksmith, Agent Shields tried various keys which he had with him and discovered that his desk key fit the box's lock. He turned the key, removed it, and slid the box with the lid still shut across the table to Mr. Bradley, saying "I'll give you the pleasure of opening up the box." Mr. Bradley then raised the lid, revealing the contents of the box, $17,080 in cash, including 28 $20 "bait" bills from the robbed bank. The agents removed, counted and separated the bills, wrapping them in paper supplied by the Bradleys and initialling the wrappers. They then replaced the money in the box and took custody of the box and its contents. Mr. Bradley testified that he took full responsibility for the opening of the box which was his decision alone,[7] that if these agents had left without opening it he would have called the FBI somewhere else, for he wanted the box opened that night.[8] It seems clear from the evidence that the Bradleys had reached an emotional state in which they had to have the box opened in the presence of witnesses and its contents made public in order to clarify the situation. Their urgent desire to learn the truth was highlighted by Mr. Bradley's statement that

---

4. The district court found as a fact that the FBI agents were not given the impression by the Bradleys that they had authority to open the box. We do not quarrel with this finding as to the agents' understanding. However, the Bradleys testified that they believed that they did have such authority and Mr. Bradley said that he had not intended to give the agents a contrary impression. The district court, which was apparently not concerned with the Brad-

leys' state of mind, made no finding on this point. Transcript, pp. 86–88, 111, 119.

5. Transcript, p. 131.

6. Transcript, p. 89.

7. Transcript, p. 111.

8. Transcript, pp. 115–116.

if the contents should prove to be innocent, he would call his niece and apologize.

The defendant contends and the district court held that these facts disclose an unreasonable search and seizure by the FBI agents of property as to which he had a justified expectation of privacy and that since the search was accomplished without a search warrant it violated the Fourth Amendment and rendered the seized property inadmissible as evidence against him. We do not agree for the reasons which we shall state.

We may lay to one side the many search and seizure cases involving a custodian of a defendant's property whom the latter has not placed in the position of being unwittingly involved in his alleged crime. When such a custodian, for example a hotel employee, yields to the demands of government agents that they be given access to the defendant's property or effects, the resulting search and seizure is uniformly held to be unreasonable in the absence of a warrant. In such a case the custodian's lack of any interest in or special relationship to the defendant's property deprives of validity the consent to the search which he has given without authority from the owner.

The present case presents a very different picture. Here the Rev. Andrew T. Bradley, an innocent man, received for safekeeping from his niece, Christine Mahone and her husband, the defendant, a metal box which she told Mrs. Bradley contained savings for their children. Thereafter Mr. Bradley learned that the defendant had been arrested for bank robbery after his return from the visit which he and Christine Mahone made to the Bradley home and that Christine Mahone had lied to the FBI about leaving the box with him. He became suspicious that the box in his possession might contain stolen property. Becoming more and more distraught, he reached a point where he could not take it any longer, contacted FBI agents and insisted that they come to his home immediately, even thought it was late at night, so that the box might be opened in their presence and the truth as to the contents thus publicly revealed. At his insistence the box, which was found to be locked, was unlocked with a key furnished by one of the agents and was opened by Mr. Bradley, an act for which he took full responsibility, and in it was discovered a large sum of money, including bills identified as stolen from the robbed bank.

These facts when contrasted with those of the usual search and seizure case highlight the basic issue which confronts us, namely, which of two conflicting rights shall prevail, the right of the defendant owner to have the privacy of his property protected against a warrantless governmental search and seizure, or the right of the custodian into whose hands that property has been placed and who has been unwittingly involved by the defendant in his alleged crime promptly and voluntarily to exculpate himself by disclosing the property and his connection with it to government officers without requiring them to secure a search warrant.

In the case of *United States v. Botsch*, 364 F.2d 542 (2d Cir. 1966), *cert. denied*, 386 U.S. 937, 87 S.Ct. 959, 17 L.Ed.2d 810 (1967), the Court of Appeals for the Second Circuit was presented with a case which similarly involved the validity of the consent to a warrantless search given by a custodian of the defendant's property who had been unwittingly involved by the defendant in his alleged crime. The facts in the *Botsch* case were, of course, not the same as those of the case before us, but the basic issue in that case was, we think, identical with that with which we are here confronted. In that case the defendant, Botsch, was engaged in a scheme to obtain by fraud through the use of the mails merchandise which was to be sold in his sporting goods store in Huntington, New York. In furtherance of the scheme, Botsch rented from one Kenneth Stein a small shack at Sayville, New York, to which the fraudulently acquired merchandise was to be shipped and he arranged with Stein, who as landlord had retained a key to the shack, to unlock it to permit delivered merchandise to be

stored inside and also to sign any required receipts. Botsch kept Stein supplied with cash to cover freight charges and came almost daily to pick up the accumulated merchandise. The fraud consisted in Botsch's purchasing the merchandise in the name and on the credit of an established business in Sayville with which he had in fact no connection. Confusion inevitably ensued, complaints were made to the post office authorities, and two postal inspectors visited Stein who willingly disclosed the full circumstances under which the shack had been rented to Botsch. Stein, by this time concerned that his property was being used for illegal purposes, unlocked the shanty and asked the inspectors if they wished to enter in order to examine what was stored there. Although they did not possess a search warrant, the officers accepted Stein's invitation and, once inside, one of them compiled a list of the shippers' names imprinted on several empty parcels found therein.

The warrantless search of the shanty thus made by the postal inspectors was attacked by the defendant as unlawful under the Fourth Amendment. The Court of Appeals for the Second Circuit held, however, that under the circumstances of the case the search was entirely reasonable[9] and did not contravene the Constitution's prohibition against unreasonable searches and seizures, saying:

> "Stein, having been made an unwitting accomplice by Botsch, had a vital interest in cooperating with the Inspectors so that he could remove any taint of suspicion cast upon him. Indeed, any individual under similar circumstances would have a right to promptly and voluntarily exculpate himself by establishing that his role in the alleged scheme was entirely innocent and passive." 364 F.2d at p. 547.

The court went on to point out that this right to exculpate oneself decisively distinguished the case from those condemned in the so-called "hotel" cases. While in each of those cases the hotel manager or clerk possessed a key to the hotel room searched, this was merely to enable the usual conveniences to be furnished the guest. In none of those cases was the manager or clerk an innocent accomplice in illegal activities. Thus it was the custodian's innocent involvement in the crime and not his possession of a key which was the significant factor making the search reasonable. Concluding its discussion of this issue the court said:

> "It would be a harsh doctrine, indeed, that would prevent an innocent pawn from removing the taint of suspicion which had been cast upon him by a defendant's cunning scheme. Stein's innocence stood or fell on the very merchandise which, only after inquiry and inspection, could exculpate him.
>
> "It is urged, moreover, that we should invalidate the November 6 search because the government failed to establish that it would have been prejudiced by any delay which would have resulted from a formal search warrant application. We recognize the force of this argument; courts should not be niggardly in extending the protection of constitutional rights and there is much to be said for interposing a magistrate between enforcement officers and potential defendants. Nevertheless, in the circumstances presented here, we are not persuaded that the officers' failure to obtain a warrant rendered the search unreasonable. Once Stein, without being urged, coerced or imposed upon, invited the inspection, we believe for the reasons already stated, that Daly and Mailloux were wholly justified in examining the premises." 364 F.2d at p. 548.

We are in agreement with the rule applied by the Court of Appeals for the Second Circuit in the *Botsch* case, namely, that the right of the custodian of the defendant's property who has been unwittingly involved by the defendant in his crime to

---

**9.** The court pointed out that the reasonableness of a search depends upon the facts and circumstances of the case, citing *United States* \ *Rabinowitz*, 339 U.S. 56, 63, 70 S.Ct. 430, 94

L.Ed. 653 (1950). *See South Dakota v. Opperman*, —— U.S. ——, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

exculpate himself promptly and voluntarily by disclosing the property and explaining his connection with it to government agents, must prevail over any claim of the defendant to have the privacy of his property maintained against a warrantless search by such agents. We are satisfied that the rule is applicable to the present case. Indeed, its application in this case is even clearer. For here it was the custodian, Mr. Bradley, who first informed the agents at New Bern of the crime and of his suspicions about the box in his possession and who insisted that they come to his home immediately the same evening, so that the box might be opened in their presence and the truth learned so that he might be exculpated. In the *Botsch* case, the inspectors had come to Stein because of information as to Botsch's alleged crime which they had received from other sources, and it was only after they had arrived on the scene and had spoken to him that he became concerned that his property, the shanty, was being used for illegal purposes and unlocked it and asked the inspectors if they wished to enter and inspect the premises, which they did without a warrant. It is true, of course, that Stein had a key and unlocked the shanty for the inspectors. We do not think that this was of any significance with respect to the question with which we are concerned, however. For the part which Botsch induced Stein unwittingly to play in the unlawful scheme required that he open the shanty to receive the fraudulently obtained merchandise, whereas the part which Christine Mahone and the defendant, Diggs, induced the Bradleys unwittingly to play required them merely to keep the box containing the stolen money safely for them, not to open it.

We yield to no one in our adherence to the rule that the courts should be liberal in upholding the Fourth Amendment's protection of privacy by requiring government agents to obtain a warrant before making a search and seizure. It is a rule which this court follows and applies.[10] Its violation is deterred by the exclusionary rule which was laid down by the Supreme Court many years ago [11] under which the government is denied the use of the fruits of a warrantless search and seizure made by its agents. The rationale of that rule [12] does not seem to us to apply to the facts of the present case, however. For here the resemblance of the FBI agents' participation in the opening and inspection of the box to the ordinary government planned search and seizure is as remote as can possibly be imagined. Here the "seizure" was the agents' acceptance of the box at the insistence of its custodian and the "search" was their participation in its opening, again at his insistence, both actions having taken place without any prior plan or intention to do so on the part of the agents who did not even know that the bank robbery had been committed until they were summoned to the Bradley home. It taxes credulity to label as an unreasonable search and seizure the action of FBI agents in responding to the urgent request of an innocent but compromised individual for aid in exculpating himself. We recall in this connection Justice Clark's remark in *Mapp v. Ohio*, 367 U.S. 643, 657, 81 S.Ct. 1684, 1693, 6 L.Ed.2d 1081 (1961): "There is no war between the Constitution and common sense."

However, if we assume that the participation of the FBI agents in the opening and inspection of the box at the insistent demand of Mr. Bradley must technically be regarded as a governmental search and seizure within the meaning of the Fourth Amendment, we think that it was validly consented to by Mr. Bradley and that the failure of the agents to obtain a search warrant was, therefore, not unreasonable. When the defendant and Christine Mahone left the box containing the stolen money with the Bradleys for safekeeping they thereby involved the latter in the alleged

10.  *See,* e. g. *United States ex rel. McArthur v. Rundle,* 402 F.2d 701, 704 (3d Cir. 1968).

11.  *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

12.  *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Stone v. Powell,* —— U.S. ——, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

crime. Therefore, by doing so they put the Bradleys in a position where they had a vital personal interest in the box, a sufficient relationship to it to entitle them to give such a permission for the search as would be binding on Diggs. This does not mean, of course, that it was a property interest which they were given. For, as the Supreme Court said in *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974), "authority which justifies the third-party consent does not rest upon the law of property," but rather upon the possession of "common authority over or other sufficient relationship to the premises or effects sought to be inspected." Just as in the ordinary case of an individual who shares with a defendant joint access to or control over property for most purposes,[13] the defendant, Diggs, must be held to have assumed the risk that the Bradleys whom he had thus involved in criminal conduct as custodians of the box might, when they learned the facts which appeared to incriminate them, disclose its contents in order to exculpate themselves, as in fact they did.

We are satisfied that under the facts of this case the part played by the FBI agents in searching and seizing the metal box at the insistence of Mr. Bradley, assuming that it was a governmental search and seizure, was not an unreasonable one within the meaning of the Fourth Amendment, and was, therefore, not in violation of that Amendment even though it was not made pursuant to a warrant. It is suggested that the test is not whether the search was reasonable but rather whether it would have been unreasonable to have required the government agency to procure a search warrant before making it. It is true that

the Supreme Court has so stated[14] although the prevailing opinions in *South Dakota v. Opperman*, —— U.S. ——, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) speak in terms of the reasonableness of the search. It has also been said that a warrantless search is *per se* unreasonable under the Fourth Amendment.[15] But at the same time, exceptions to this apparently absolute rule have been recognized,[16] for example, in the case of a search consented to by one who is deemed to have had authority to give consent. In these exceptional cases it has been held that it would be unreasonable to require the procurement of a search warrant. In upholding warrantless searches in these exceptional cases the courts are, of course, necessarily holding that the searches were not unreasonable within the prohibition of the Fourth Amendment. It must be concluded, we believe, that a governmental search is constitutionally reasonable if it would be unreasonable under the circumstances to require the prior procurement of a search warrant and that, by the same token, such a search is constitutionally unreasonable if, under the circumstances, it would be reasonable to require the agents to obtain a search warrant. It would appear, therefore, that the question whether we should focus on the reasonableness of requiring the procurement of a search warrant rather than on the reasonableness of the search itself is largely one of semantics.

We would accordingly reverse but since six judges do not concur in this disposition and we do not favor affirmance we are constrained to join with Judge Gibbons in directing that the order of the district court be vacated and the case remanded for the finding referred to in Judge Gibbons' opinion. Upon such remand it will, of course,

13. *See United States v. Matlock*, 415 U.S. 164, 169–171, 94 S.Ct. 988, 39 L.Ed.2d 242 and cases there cited.

14. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. United States District Court*, 407 U.S. 297, 315, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

15. *See Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Cady v.*

*Dombrowski*, 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

16. *South Dakota v. Opperman*, —— U.S. ——, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

be open to the court to make any further additional findings which it may deem relevant to a just determination in the light of the opinions filed in the case.

It will be so ordered.

ADAMS, Circuit Judge (concurring).

The circumstances of this case are unique. The search, although made with the cooperation of FBI agents, was initiated by a private person and pursued at his insistence. There was no question of governmental overbearing with respect to the apparent possessor of the box that was to be searched. This was not an instance where the police in the course of an investigation sought out an opportunity to conduct an inspection of suspect premises. As the factual accounts of the district court[1] and this Court indicate, the FBI agents did not regard the matter as pressing, and they visited Rev. Bradley only in order to accommodate an overwrought citizen, who was concerned about his own inadvertent implication in a serious crime.

Significantly, Rev. Bradley's narrative and the confirmatory telephone call to Harrisburg gave the agents probable cause to conduct a search.[2] There appears to be no question of that. Nor is this the sort of case where the reconstruction of probable cause must be done on the basis of a dubious "swearing contest"—between the accused on the one hand and the searching officers on the other—over disputed facts, the sort of situation which would make a court regret the absence of a prior presentation of the probable-cause basis for a search warrant before a detached magistrate. The testimony of the agents is corroborated in all significant respects by the testimony of Rev. and Mrs. Bradley.

In short, the contours of the present case are far from those to which the Supreme Court has typically addressed itself as it has composed the law of search and seizure, and particularly the law of consent searches.[3] Although in such cases the Court has declared that a search without a warrant is *per se* illegal, even when supported by probable cause, except in certain limited and exceptional instances,[4] the facts of this disputed search would overcome all but an irrebuttable presumption of illegality. Strict insistence on technical compliance— and here the agents could have obtained a warrant had they sought one—would overlook the confluence of expectations and

1. *United States v. Diggs*, 396 F.Supp. 610 (M.D. Pa.1975).

2. *Id.* at 613.

3. *See United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).
Perhaps the case most analogous to the present one, is *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), where a landlord detected a smell of mash emanating from a house that he had rented to a tenant. The landlord called the police, who also smelled the odor. The police testified that the landlord told them "to go in the window and see what['s] what in there." The landlord related that he had said "if it's what I think it is, what it smells like, yes, you can have my permission to go in." The evidence of illegal liquor manufacture found during the subsequent warrantless search was ultimately suppressed by the Supreme Court since, although there was probable cause, the landlord could not give consent to search the tenant's premises.
This case is distinguishable from *Chapman*. Here the probable cause to search is much clearer than it was in *Chapman*. Moreover,

Rev. Bradley had a very substantial, albeit limited, real possessory interest in the metal box that had been surrendered to his keeping. In contrast, the landlord in *Chapman* retained only a residual interest in the property. Finally, absent here, but underlying the *Chapman* decision, was the special sanctity accorded houses in search cases decided prior to *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Although *Katz* appeared to afford equal protection of the fourth amendment guarantees wherever there is an expectation of privacy, the former special status of houses and offices relative to other premises and effects would appear to retain some vitality today. *See South Dakota v. Opperman*, —— U.S. ——, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

4. *See United States v. United States District Court*, 407 U.S. 297, 315–16, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Agnello v. United States*, 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145 (1925).

events impinging upon the agents who responded to Rev. Bradley's call.[5] To suppress the evidence found in the metal box might frustrate a criminal prosecution, but it is not at all clear that it would serve the underlying purpose of the exclusionary rule,[6] since the activity in question does not appear to be the sort of premeditated police intrusion that the exclusionary rule is meant to deter.

I am persuaded that this search is sufficiently different from those to which the *per se* rules have been applied so that it should be judged in the light of its own circumstances.[7] So viewed, the search, in my judgment, cannot be regarded as unreasonable.

Accordingly, I would reverse, but since six judges do not concur in that disposition and I do not favor affirmance, I reluctantly join in vacating the order of the district court and remanding the case for further findings.

GIBBONS, Circuit Judge (concurring).

I join in Judge Maris' opinion up to the point in his analysis where he concludes that a gratuitous bailee has authority to surrender possession of a locked box, which he suspects contains contraband, to the authorities. At that point, however, I believe a more refined analysis of the various property and privacy interests at stake in this case is required.

In prohibiting unreasonable searches and seizures, the fourth amendment clearly protects both property and privacy interests.[1] In this case, unlike many others, both interests are intimately involved and analytically separable. The property interest issue is whether or not a voluntary bailee who has been entrusted with a locked box, which he has reasonable cause to believe contains contraband, has a sufficient possessory interest that he can consent to a transfer of possession to authorities; i. e., consent to a seizure. The privacy interest issue is whether or not the defendant, who locked the box and kept the key, has a reasonable expectation of privacy with respect to its contents, which continues when the box is left with a gratuitous bailee and when it is subsequently transferred by the bailee to F.B.I. Agents.

I agree with Judge Maris that Defendant Diggs and Christine Mahone, by leaving the locked box containing the stolen money with the Bradleys for safekeeping, implicated them in the alleged bank robbery as possible accessories after the fact. The implicit terms of the Bradleys' bailment enti-

**5.** *See Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

**6.** For a recent discussion of the purpose of the exclusionary rule, see *Stone v. Powell*, —— U.S. ——, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

**7.** *See South Dakota v. Opperman*, —— U.S. ——, ——, 96 S.Ct. 3092, 49 L.Ed.2d 1000, where the opinion of Chief Justice Burger, writing for himself and three other Justices and joined in by Justice Powell, cites with approval the concurring and dissenting opinion of Justice Black in *Coolidge v. New Hampshire*, 403 U.S. 494, at 509–510, 91 S.Ct. 2022 at 2060: "The test of reasonableness cannot be fixed by *per se* rules; each case must be decided on its own facts." *But see* the concurring opinion of Justice Powell, —— U.S. ——, ——, 96 S.Ct. 3092, 49 L.Ed.2d 1000, which adheres to the *per se* rules applied in prior cases.

It is interesting to note that the First Congress framed the warrant requirement of the Fourth Amendment with particular concern to protect against the abuses of the general warrants and writs of assistance that had been employed by the Crown to permit searches without any particular cause. In contrast, there seems not to have been an equivalent concern about abuses of warrantless searches. From this history, it is possible to infer that the prohibition against unreasonable searches and seizures was originally intended to be applied independently of the warrants clause, which had a limited function. This understanding of the separate purposes of the different sections of the Fourth Amendment is, of course, at variance with the reading that has been adopted in the last half-century. See Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L.Rev. 349, 361–67 (1974).

**1.** *See, e. g., California Bankers Ass'n v. Shultz*, 416 U.S. 21, 52–54, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *Katz v. United States*, 389 U.S. 576, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Friedman*, 532 F.2d 928, 934 (3d Cir. 1976).

tled them to exclusive possession of the locked box, but because Diggs retained the key they were allowed access to and could exercise control over only the exterior of the box. Given this limited possessory interest and Diggs' reasonable expectation of privacy when he left the locked box with them, I believe the Bradleys could consent to a transfer of possession of the locked box to the F.B.I. Agents. But the Bradleys' possessory interest, I submit, did not authorize them to surrender Diggs' expectation of privacy with respect to the contents of the box which he certainly asserted by retaining possession of the key; i. e., the Bradleys could not consent to a search. Thus, unlike Judge Maris, I would adopt a narrower version of the Second Circuit rule announced in *United States v. Botsch*, 364 F.2d 542 (2d Cir. 1966), *cert. denied*, 386 U.S. 937, 87 S.Ct. 959, 17 L.Ed.2d 810 (1967), by limiting the scope of the bailee's authority to consent to a search or seizure of defendant's property to the scope of his authority under the terms of the bailment.[2] Moreover, I would define and limit the Bradleys' special relationship to the locked box for purposes of the third-party consent rule announced in *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), in terms of the parties' respective property and privacy interests.

The source of the F.B.I. Agents' authority to search the contents of the box, then, must be found elsewhere than in the Bradleys' interest in disassociating themselves from a potentially incriminating possession of stolen money and thereby removing a

cause of considerable emotional turmoil. Since the voluntary bailees could and did lawfully surrender their property-possessory interest to the F.B.I. Agents, the focus of the inquiry must shift from the authority of the Bradleys to the authority of the agents. At this point in the sequence of events the facts[3] indicate that there was unquestionably sufficient federal participation in the search to invoke the guarantees of the fourth amendment.[4] Since the agents were lawfully in possession of the box, it seems to me that they were authorized to make an inventory search. The Supreme Court has consistently held that the police may conduct inventory searches of motor vehicles lawfully though involuntarily in their possession. *South Dakota v. Opperman*, — U.S. ——, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) (per curiam); *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). In the factual settings of *Opperman, Harris* and *Cooper*, as well as in this case, police possession of the movable chattel, which provided a place of concealment, was lawfully obtained without the consent of the owner. No principled distinction, I submit, can be made for inventory search purposes between lawful possession of a car and lawful possession of a box.[5]

*South Dakota v. Opperman, supra*, however, which is the Court's most recent exposition of the inventory search exception to the fourth amendment protection of privacy, seems to me to require a finding not only that an inventory search could proper-

2. *See United States v. Botsch*, supra at 550–51 (Smith, J. dissenting).

3. Agent Shields took the initiative in trying to open the box but found it was locked. While the other agent was trying to locate a locksmith, Agent Shields tried to open the box with several keys of his own, found one that fit and turned it, and only then allowed Reverend Bradley to lift the lid. *See* Tr. at 27–30. The testimony of Reverend Bradley at the suppression hearing, which was credited by the district judge, indicates that the federal agents' participation was the necessary and sufficient factor in the conduct of the search. *See* Tr. at 115–16.

4. *See, e. g., United States v. Newton*, 510 F.2d 1149 (7th Cir. 1975); *Corngold v. United States*, 367 F.2d 1, 4–6 (9th Cir. 1966) (en banc). At the very least, the search must be deemed a joint enterprise by Bradley and the F.B.I. Agents, and thus a federal search for the purposes of the fourth amendment. *Cf. Byars v. United States*, 273 U.S. 28, 33, 47 S.Ct. 248, 71 L.Ed. 520 (1927).

5. *But see United States v. Chadwick*, 532 F.2d 773, 781–85 (1st Cir. 1976), *petition for cert. filed*, 44 U.S.L.W. 3740 (U.S. May 27, 1976) (No. 75–1721).

ly have been made, but also that the search in question was conducted for inventory purposes. The opinion of the Court [6] and the concurring opinion of Justice Powell [7] both emphasize that the inventory search was conducted pursuant to standard departmental procedures with respect to the caretaking of chattels lawfully in police custody. Significantly, in footnote 4 of the opinion of the Court, Justice Burger distinguishes federal searches:

In contrast to state officials engaged in everyday caretaking functions:

"The contact with vehicles by federal law enforcement officers usually, if not always, involves the detection or investigation of crimes unrelated to the operation of a vehicle." *Cady v. Dombrowski, supra,* 413 U.S. at 440, 93 S.Ct. at 2527.[8]

I do not understand this quotation from *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), to be a suggestion that federal police officials cannot conduct inventory searches. Rather, I believe it is a recognition that the search, to be justified under the inventory exception, must in fact have been for that purpose, and not for an investigatory purpose.[9]

6. —— U.S. at ——, 96 S.Ct. 3092.

7. Id. at ——, 96 S.Ct. 3092 (Powell, J. concurring).

8. Id. at —— n. 4, 96 S.Ct. at 3097.

9. The Chief Justice concluded that just [a]s in *Cady,* there is no suggestion whatever that this standard [caretaking] procedure, essentially like that followed throughout the country, was a pretext concealing an investigatory police motive. (footnote omitted). Id. at ——, 96 S.Ct. at 3100. Justice Powell, amplifying this conclusion of the Chief Justice, wrote in his concurring opinion that:

The routine inventory search under consideration in this case does not fall within any of the established exceptions to the warrant requirement. But examination of the interests which are protected when searches are conditioned on warrants issued by a judicial officer reveals that none of these is implicated here. A warrant may issue only upon "probable cause." In the criminal context the requirement of a warrant protects the individual's legitimate expectation of privacy against the overzealous police officer. "Its protection consists in requiring that those inferenc-

In this case, however, the government offered no evidence of standard F.B.I. procedures governing inventories of and receipts for personal property coming into the possession of its agents. Instead, the government chose to argue that the Bradleys possessed the authority to consent to the agents' search of the locked box. In my view, as explained earlier, reliance upon that strategy could only have justified the Bradleys' lawful transfer of possession of the locked box to the F.B.I. agents but not the subsequent search. Because the district court rejected the government's consent theory entirely, it made no findings with respect to the agents' purpose in searching the inside of the box. Nevertheless, it is entirely possible that the agents were acting pursuant to standard F.B.I. procedures designed to safeguard the property coming into their possession as well as to protect the Bureau from any claims arising out of this caretaking function.

Since there was no finding on this critical issue by the district court, I cannot vote to reverse. I would vacate the judgment and remand for further findings in light of *South Dakota v. Opperman, supra.*

es [concerning probable cause] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14 [68 S.Ct. 367, 369, 92 L.Ed. 436] (1948). See, *e. g., United States v. United States District Court, supra,* 407 U.S. at 316–318 [92 S.Ct. 2125 at 2136]. Inventory searches, however, are not conducted in order to discover evidence of crime. The officer does not make a discretionary determination to search based on a judgment that certain conditions are present. Inventory searches are conducted in accordance with established police department rules or policy and occur whenever an automobile is seized. There are thus no special facts for a neutral magistrate to evaluate. (footnote omitted). Id. at ——, 96 S.Ct. at 3103 (Powell, J. concurring). *See generally* Miles & Wefing, The Automobile Search and the Fourth Amendment: A Troubled Relationship, 4 Seton Hall L.Rev. 105, 135–143 (1972); Note, Warrantless Searches and Seizures of Automobiles, 87 Harv.L.Rev. 835, 848–853 (1974).

My position, that there must be a separate analysis of the property and privacy aspects at stake in this case, and that the inventory search exception applies only where the court finds that an inventory search, not an investigatory search, was in fact intended, is not attractive to any of my colleagues. But Judge Adams' alternative approach, that the reasonableness of police conduct for fourth amendment purposes should be judged by a sort of totality-of-the-circumstances test, is equally unattractive to me. There is already far too much unbridled discretion in law enforcement. To accept the police officer's subjective evaluation of the reasonableness of his actions as the appropriate test for omitting a search warrant is, in my judgment, to eliminate the warrant requirement for all practical purposes. Possibly Judge Adams accurately forecasts the direction of fourth amendment jurisprudence.[10] I am content, however, to await its arrival rather than to anticipate it.

VAN DUSEN, Circuit Judge (dissenting): "The old saw that hard cases make bad law has its basis in experience. But petty cases are even more calculated to make bad law. The impact of a . . . little case is apt to obscure the implications of the generalization to which the case gives rise." *United States v. Rabinowitz*, 339 U.S. 56, 68, 70 S.Ct. 430, 436, 94 L.Ed. 653 (Frankfurter, J., dissenting) (1950). Because I believe the rationales articulated in the opinions of Judges Maris, Gibbons and Adams conflict with the commands of the Fourth Amendment, I respectfully dissent and would affirm the district court judgment.

## I.

It is important at the outset to emphasize certain findings of fact which, in my view, do not appear with sufficient clarity in the plurality opinion. These findings have not been challenged as clearly erroneous and are supported by the record. The findings and other relevant testimony are as follows:

(1) With respect to the availability of a search warrant, the district court found "that there was a United States Magistrate domiciled in New Bern and that it would take approximately two hours to obtain a search warrant and return to the Bradley home." *United States v. Diggs*, 396 F.Supp. 610, 612 (M.D.Pa.1975).

(2) With respect to Rev. Bradley's purported desire to make public the sealed contents of Diggs' box in order to exculpate himself from possible implication in the alleged crime:

(A) Rev. Bradley himself testified:

"Q. [By the prosecutor] What concerns did you have about getting in contact [with the F.B.I.?]

A. About this, this right here. All of this.

Q. Getting you implicated?

A. Well, not necessarily me implicated, because, you know, I know I didn't do anything. You know what I mean? But this. What we see here now.

Q. All right.

A. You see? So that's what I was concerned about. The fact—well, O.K., Chrissy's being personalized; and Chrissy's my niece; and Chrissy and I were raised together.

Q. All right.

A. So I explained that to [a friend whom Bradley consulted and on whose advice he finally contacted the lawyer and the F.B.I.]."

Transcript at 102–03. See also *id.* at 119–20.

(B) The record establishes that Rev. Bradley's "main interest . . . was . . . to find out what was in the box,"[1] so that he could finally confirm or dispel his suspicions and concerns about his niece.[2]

---

10. *See, e. g., United States v. Peltier*, 422 U.S. 531, 542, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975).

1. Transcript at 88; see *id.* at 105, 116, 119.

2. Transcript at 17, 26, 35–37, 39, 62, 102–03. See also *id.* at 101–02.

(C) Bradley had kept the box for several days and apparently felt safe with his possession of it as long as he did not tamper with it in the absence of witnesses.[3]

(D) In light of the testimony and despite the Government's assertion that Rev. Bradley "was very apprehensive over his continual possession of the box" and "was most concerned about his own possible involvement," [4] the district court found "that the Agents felt that Rev. Bradley was honest, truthful, trying to do the right thing, and genuinely concerned about the box, its contents, and his *niece's possible involvement*." (Emphasis supplied.) [5] *United States v. Diggs, supra,* 396 F.Supp. at 612.

(3) With respect to Rev. Bradley's emotional state, the district court found:

"Rev. Bradley, despite his distress, would have been satisfied if the Agents left for two hours to procure a warrant."

*United States v. Diggs, supra,* 396 F.Supp. at 612.

Rev. Bradley had already waited for several days without approaching his lawyer or law enforcement officials. He had not tampered with or opened the box during that time and would not have done so if the Agents had been unable to come to his house when he called.[6] Although Rev. Bradley would have preferred the Agents to conduct the search without delay, he was not so insistent that he would not "go along" with a delay.

(4) With respect to the Agents, in contrast, the district court found that, although

Rev. Bradley initiated the idea of the search and wanted the box opened:

(A) The Agents, after verifying the essential details of the alleged crime in an official call to Harrisburg,[7] "strongly suspected that the box contained money or material related to the bank robbery." *United States v. Diggs, supra,* 396 F.Supp. at 613.

(B) The Agents "practically monopolized the effort" to search the box. *Id.* at 614.

(C) "[The Agents] knew that the box was not [Bradley's] and, . . . he had not indicated to them that he had the owners' permission to open the box. As a matter of fact, he promised that he would call and apologize if the contents were non-incriminating." *Id.* at 613.

(D) "[T]he Bradleys did not give the Agents the impression that they had authority to open the box." *Id.* at 612.[8]

(E) "[T]here was no reason to believe, and the Agents did not believe, that Rev. Bradley would open, secrete, or otherwise interfere with the box if the Agents decided to obtain a search warrant, a matter that would involve only two hours." *Id.* at 613.

After making the foregoing findings of fact and considering the live testimony he had heard, the district judge concluded:

"Under the circumstances, unless the warrant requirement of the Fourth Amendment is to be reduced to a nullity, the Agents should have presented this matter to a magistrate. The inconvenience to the officers and some slight delay

---

**3.** Transcript at 9–10, 119–20. Rev. Bradley did want witnesses present when the box was opened and had no interest in retaining the box if it contained contraband. *Id.* at 9–10, 31, 34.

**4.** Government's Brief in Opposition to the Defendant's Motion to Suppress, at page 2, Document 20 (M.D.Pa., Crim. No. 75–56). The Government has the burden of proving facts justifying an exception to the warrant requirement. *United States v. Matlock,* 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

**5.** At no time was Rev. Bradley suspected of complicity in the alleged crime.

**6.** Transcript at 115, 122–23.

**7.** Agent Fanning asked the Agent in Harrisburg to send a list of the serial numbers of the bait bills taken in the alleged robbery in case the box contained money. Transcript at 23, 42–43.

**8.** Rev. Bradley did not think he had been authorized to open the box and believed the box was personal to Christine and Diggs. Transcript at 122. Rev. Bradley was, however, willing to take the responsibility if the contents proved innocent, and in this sense believed he had "authority." *Id.* at 87–88, 110–11.

necessary to prepare papers and present the evidence to a magistrate are never very convincing reasons to bypass the Constitutional requirement. *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948)."

*United States v. Diggs, supra*, 396 F.Supp. at 613. I agree with the district court that a bailee's preference to have the Government conduct a search of another person's property without delay is insufficient reason to ignore the owner's constitutionally guaranteed right to a search that has been approved in advance by a judicial officer based on a determination of probable cause.

With this background, I turn to a discussion of (1) the Fourth Amendment's warrant requirement, (2) the applicability of exceptions to that requirement, and (3) the exclusionary rule.

## II.

The Fourth Amendment to the Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Based on settled principles of Fourth Amendment jurisprudence, any analysis of the warrantless search and seizure in this case should commence with the rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." [9] But the plurality opinion fails to mention either this "most basic constitutional rule in [the Fourth Amendment] area" [10] or its equally well-settled corollary that the exceptions to the warrant requirement are "jealously and carefully drawn." [11]

The "reasonableness" standard endorsed by the plurality opinion is contrary to the above-quoted principles. It is, in essence, the *Rabinowitz* approach to the Fourth Amendment.[11a] See *United States v. Rabinowitz, supra*, 339 U.S. at 63, 66, 70 S.Ct. 430. But *Rabinowitz*, which is cited in the plurality opinion and in *United States v. Botsch*[12] on which the plurality relies, was overruled in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). And attempts to resuscitate it in the search context [13] have been rejected.[14] As the Supreme Court explained in *United States v. United States District Court*, 407 U.S. 297, 315, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972):

"specifically established," "well-delineated," "jealously and carefully drawn," and generally based on absolute necessity. See note 16 *infra* and accompanying text. Separated from their narrow justifications, the exceptions would indeed be "enthroned into the rule." *United States v. Rabinowitz, supra*, 339 U.S. at 80, 70 S.Ct. 430 (Frankfurter, J., dissenting).

9. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967), see, *e. g., Cady v. Dombrowski*, 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. United States District Court*, 407 U.S. 297, 315–16, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

10. *Coolidge v. New Hampshire*, 403 U.S. 443, 454, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971).

11. *Jones v. United States*, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); see *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

11a. The difference between the *Rabinowitz* approach and the approach reflected by the quoted rules is a question of "semantics" only if we cast aside the notion that the exceptions are

12. 364 F.2d 542, 547 (2d Cir. 1966), *cert. denied*, 386 U.S. 937, 87 S.Ct. 959, 17 L.Ed.2d 810 (1967).

13. Compare *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (warrantless arrest in a public place).

14. The *Rabinowitz* approach did not attract a majority in *South Dakota v. Opperman*, —— U.S. ——, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

"Though the Fourth Amendment speaks broadly of 'unreasonable searches and seizures,' the definition of 'reasonableness' turns, at least in part, on the more specific commands of the warrant clause. Some have argued that '[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable,' *United States v. Rabinowitz,* 339 U.S. 56, 66 [70 S.Ct. 430, 435, 94 L.Ed. 653] (1950). This view, however, overlooks the second clause of the Amendment. The warrant clause of the Fourth Amendment is not dead language."

The warrant requirement, in short, is not a formality or "an inconvenience to be somehow weighed" against conflicting rights or claims of police efficiency.[15] Rather it is the crucial and fundamental directive of the Fourth Amendment to be dispensed with only when "the exigencies of the situation made that course imperative."[16] The danger of any view of the Fourth Amendment that turns solely on a determination of "reasonableness" was explained in *Chimel v. California,* 395 U.S. 752, 764–65, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and repeated in *United States v. United States District Court, supra,* 407 U.S. at 315 n. 16, 92 S.Ct. at 2136, in language that is particularly pertinent here:

"[A] general 'reasonableness' standard without reference to the warrant clause . . . [is] 'founded on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests. Under such an unconfined analysis, Fourth Amendment protection in this area would approach the evaporation point.'"

See also *Chimel v. California,* 395 U.S. 752–765, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), quoting *United States v. Rabinowitz, supra,* 339 U.S. at 83, 70 S.Ct. 430 (Frankfurter, J., dissenting).

I respectfully suggest that the analysis employed by the plurality ignores the fact that the warrant requirement is the "very heart of the Fourth Amendment directive."[17] Since the policies underlying that requirement are fully applicable here,[18] I turn immediately to the question of whether any of the few "specifically established and well-delineated exceptions" to the warrant requirement apply in this case.

### III.

As an alternative to its "reasonableness" analysis, the plurality concludes that the warrantless search and seizure in this case falls within the recognized exception for consent searches because Rev. Bradley had authority to consent to the search. To consent to a warrantless search affecting the interests of another, the consenting party must possess "common authority over or

---

**15.** *United States v. United States District Court, supra,* 407 U.S. at 315, 92 S.Ct. at 2125, quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 481, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).
"The Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised." *United States v. United States Distrct Court, supra,* 407 U.S. at 317, 92 S.Ct. at 2137. See note 18, *infra.*

**16.** *McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948); see *Chimel v. California, supra,* 395 U.S. at 760–61, 89 S.Ct. 2034. The consent exception to the warrant requirement is predicated on a theory other than necessity.

**17.** *Gerstein v. Pugh,* 420 U.S. 103, 113 n. 12, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975), quoting *United States v. United States District Court,* 407 U.S. 297, 316, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

**18.** At least two interests are served by the warrant requirement. Where possible, it places discretionary decisions on whether to search in the hands of a neutral and detached party who is better able than those with personal interests at stake to determine whether the special facts justify an invasion of a citizen's privacy. Prior authorization protects against "hindsight justification" and preserves "the effectiveness of post-search review." *South Dakota v. Opperman, supra,* —— U.S. at ——, 96 S.Ct. at 3103 (Powell, J., concurring); see *United States v. Martinez-Fuerte,* —— U.S. ——, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). *Cf. Beck v. Ohio,* 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Both of these interests play a significant role in cases of this nature.

other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974).

> "Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest on the law of property, . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

*Id.* at 171 n. 7, 94 S.Ct. at 993; see *Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

Although it is clear that Bradley did not have authority to consent to the search under the "common authority" test enunciated in *Matlock,*[19] the plurality concludes that Bradley had an "other sufficient relationship" to the interior of the locked box that empowered him to permit a search of its contents. The thrust of their view is that Diggs must be held to have "assumed the risk" that Bradley would consent to a search by Government officials. I cannot agree.

First, the plurality's analysis ignores the fact that application of the "carefully delineated" common authority approach leads unequivocally to the conclusion that Diggs

and Chris had not, for Fourth Amendment purposes, "assumed the risk" that Rev. Bradley might permit a warrantless search. By retaining the key, Diggs and Chris indicated to all who came in contact with the box that they maintained an expectation of privacy in the interior of the sealed container.[20] The Supreme Court's and this Circuit's cases hold that such a clearly asserted privacy interest is worthy of the protection of the Fourth Amendment. See, *e. g., Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); *United States ex rel. Cabey v. Mazurkiewicz,* 431 F.2d 839 (3d Cir. 1970).

The principle that exceptions to the warrant requirements must be "zealously and carefully drawn," *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958), applies with particular force in the case of third party consents. As we stated in *United States ex rel. Cabey v. Mazurkiewicz,* 431 F.2d 839 (3d Cir. 1970),

> "It is fundamental that the doctrine which recognizes the validity of a third party's consent to a search must be applied guardedly to prevent erosion of the protection of the Fourth Amendment, since it makes no requirement of the existence of probable cause for the search and does not constitute an exception based on necessity."

*Id.* at 843; see *United States v. Dichiarinte,* 445 F.2d 126, 129 n. 1 (7th Cir. 1971). Moreover, clear and unambiguous rules governing exceptions to the warrant requirement are prerequisites to the effectiveness of the exclusionary rule. Accordingly, I would not interpret *Matlock* as endorsing a pure as-

---

**19.** The cases have uniformly held that the consenting party must have joint access for most purposes to an area that has not been set aside for the exclusive use of another. See, *e. g., United States v. Bussey,* 507 F.2d 1096, 1097 (9th Cir. 1974); *United States v. Pravato,* 505 F.2d 703, 704 (2d Cir. 1974); *United States v. Heisman,* 503 F.2d 1284, 1288–89 (8th Cir. 1974); *United States ex rel. Cabey v. Mazurkiewicz,* 431 F.2d 839, 842–43 & n. 20 (3d Cir. 1970); *Gurleski v. United States,* 405 F.2d 253, 262 (5th Cir. 1968), *cert. denied,* 395 U.S. 981, 89 S.Ct. 2140, 23 L.Ed.2d 769 (1969); *United States v. Poole,* 307 F.Supp. 1185, 1188–89

(E.D.La.1969); *United States v. Brown,* 300 F.Supp. 1285 (D.N.H.1969); *United States v. White,* 268 F.Supp. 998, 1001–02 (D.D.C.1966). Here there was no joint access to the interior of the locked metal box for *any* purpose, no common area, and no mutual use.

**20.** See *United States ex rel. Cabey v. Mazurkiewicz,* 431 F.2d 839, 843–44 (3d Cir. 1970); *Corngold v. United States,* 367 F.2d 1, 7 (9th Cir. 1966) (en banc); *United States v. Millen,* 338 F.Supp. 747, 753 (E.D.Wis.1972); *United States v. Brown,* 300 F.Supp. 1285 (D.N.H. 1969).

sumption of the risk test for third party consents. See also part II above.

Second, the conclusion that Rev. Bradley had authority to consent to this search appears to conflict with *Chapman v. United States, supra.* In that case, all of the factors present here—a successful search, probable cause based on undisputable facts,[21] and a search process initiated and encouraged[22] by a consenting landlord who called the police and told the officers " 'to go in the window and see what['s] what in there' "—concurred. Rejecting the contention that the landlord, who had no key, had an interest in admitting the police, the Supreme Court, with only one dissent, held the search unlawful.

> "[T]o uphold such an entry, search and seizure 'without a warrant would reduce the [Fourth] Amendment to a nullity and leave [tenants'] homes secure only in the discretion of [landlords].' "

*Id.* 365 U.S. at 617, 81 S.Ct. at 780. In my view, *Chapman* is indistinguishable from the case at bar.

Third, the suggestion that Rev. Bradley had a "vital personal interest" in exculpating himself by permitting the authorities to search the interior of the box from which Diggs had excluded them does not, in my view, justify the conclusion that this warrantless search was valid.

As noted in part I above, the record does not support the assertion that either Rev. Bradley's anxiety or his desire to see the contents of the box stemmed from a concern for his own legal position.[23] Bradley's "vital personal interest" was no greater than that of any bailee of sealed property which he believes may contain contraband or other evidence of a crime. And, if Bradley's interest here is enough to empower him to permit a warrantless Governmental search, it is difficult to see how a rule authorizing such searches could be limited. Compare *Corngold v. United States,* 367 F.2d 1, 7 (1966) (en banc), *overruling Marshall v. United States,* 352 F.2d 1013 (9th Cir. 1965), *cert. denied,* 382 U.S. 1010, 86 S.Ct. 618, 15 L.Ed.2d 526 (1966). Are the constitutional rights of the bailor to be dependent, for example, on whether he paid 25¢ for the bailment? Compare *United States v. Botsch,* 364 F.2d 542 (2d Cir. 1966), *cert. denied,* 386 U.S. 937, 87 S.Ct. 959, 17 L.Ed.2d 810 (1967).

Finally, it is difficult to see how Bradley's "right" to exculpate conflicted with Diggs' Fourth Amendment right to a search that had been approved in advance by an impartial magistrate. Whatever interest Bradley had in purging himself of any possible taint ceased to operate once Bradley had notified the authorities of the existence of the locked box, explained the circumstances surrounding his possession of it, and physically turned the box over to Government agents. I cannot find any support in the district court findings for the plurality opinion's statements that Rev. Bradley insisted that the box be opened prior to the issuance of a search warrant. In any event,

---

**21.** Consent searches have never turned on the existence of probable cause. See *United States ex rel. Cabey v. Mazurkiewicz,* 431 F.2d 839, 843 (3d Cir. 1970). Nor does the probable cause factor assume importance because it subsequently turns out on judicial review that the facts constituting probable cause are undisputed. That is true in virtually hundreds of warrantless search cases. It is a "basic rule [that] 'has never been questioned'," *Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970), that:

> "[b]elief, however well founded, that an article sought is concealed . . . furnishes no justification for a search of that place without a warrant. And such searches are . . . unlawful notwithstanding facts unquestionably showing probable cause."

*Agnello v. United States,* 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925).

**22.** Although Bradley was a continuing force, the Agents strongly suspected that the box contained contraband and actually initiated the physical search process when they asked Rev. Bradley to bring them the box. See note 7, *supra* and accompanying text.

**23.** A rule which requires police officers and courts to examine the motives of consenting bailees seems impractical and subject to easy abuse. Moreover, by relying on the exculpation theory, the plurality opinion imports into the consent exception a factor akin to the concept of probable cause.

the Rev. Bradley exculpated himself when he turned the box over to the F.B.I. Agents. They did not believe that he would open it if they went to get a search warrant.

Because I cannot understand how a two-hour delay would denigrate Bradley's purported "right" to exculpate himself or how an immediate search would further Bradley's legitimate interests, I am unable to see how Bradley's exercise of the "right" to exculpate has any bearing on the need for a warrant or can furnish any excuse for circumventing the warrant requirement. It is for this reason, as well as others discussed in the margin,[24] that I am not persuaded by the reliance on *United States v. Botsch* in Judge Maris' opinion.

With reference to the concurring opinion of Judge Gibbons, it should be stated that nothing in the record before us indicates that the only thing the Agents desired was an inventory of the contents of the box. To the contrary, the Agents here were actively seeking contraband, a far cry from the routine inventory search authorized by *South Dakota v. Opperman, supra* note 4. *Opperman* does not, in my view, justify a remand under the circumstances of this case.

The district court's findings and the record indicate that before the locked box was opened, the Agents knew a crime had allegedly been committed. They knew that Diggs was a suspect, and they "strongly suspected," after hearing and confirming Rev. Bradley's story, that the box contained stolen contraband. See note 7 *supra* and accompanying text. The whole purpose of the search was exploratory: its entire object to determine whether the box contained contraband.[25]

Since I am not persuaded that any of the recognized exceptions to the warrant requirement is applicable under the circumstances of this case, I must conclude that the disputed search was unlawful. I turn briefly to a discussion of the Fourth Amendment's exclusionary rule.

### IV.

As I understand it, Judge Adams' view of this case rests on the twin assertions that (1) the "contours of the present case are far from those to which the Supreme Court has typically addressed itself" and (2) "the activity [of the FBI] does not appear to be the sort of premeditated police intrusion which the exclusionary rule is meant to deter." My difficulties with this analysis are twofold.

First, I believe the Supreme Court has addressed itself to a nearly identical factual situation in *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) and has concluded that the search was unlawful and that the Fourth Amendment's exclusionary rule mandated suppression. As noted above, *Chapman* appears to be indistinguishable from the present case.[26]

24. *United States v. Botsch* relied on *United States v. Rabinowitz, supra,* which has since been overruled. See part II above. *Botsch* also derived its exculpation theory from *Marshall v. United States,* 352 F.2d 1013 (9th Cir. 1965), *cert. denied,* 382 U.S. 1010, 86 S.Ct. 618, 15 L.Ed.2d 526 (1966), a case that is virtually identical to the case at bar. Compare *People v. Nunn,* 55 Ill.2d 344, 304 N.E.2d 81 (1973) (suppressing evidence on virtually identical facts). But after the decision in *Botsch, Marshall v. United States* was overruled by the Ninth Circuit sitting en banc. See *Corngold v. United States,* 367 F.2d 1, 7–8 (9th Cir. 1966) (en banc). Further, the majority in *Botsch* explicitly distinguished *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), on the ground that the landlord in *Botsch,* unlike the one in *Chapman,* possessed a key to the premises. *United States v. Botsch, supra,* 364

F.2d at 547–48. The landlord in *Botsch* had access to the shack and, by his fully authorized use of the key to go into the shack, became "inextricably intertwined with [the] alleged scheme." "[He] was not an inactive landlord, aloof from his tenant's activities and immune from any taint that inhered in them." *Id.;* see *United States v. Poindexter,* 325 F.Supp. 786, 791–92 (S.D.N.Y.1971).

25. For this reason, among others, I believe *South Dakota v. Opperman, supra,* is inapposite. See also note 18 *supra* and note 26 *infra.*

26. See notes 21–22 *supra* and *Chapman v. United States, supra,* 365 U.S. at 617, 81 S.Ct. 776 quoting *Jones v. United States,* 362 U.S. 257, 266–67, 78 S.Ct. 1253, 2 L.Ed.2d 1314 (1960). Any distinction between houses and "effects" for Fourth Amendment purposes was

Second, the Supreme Court has not limited the Fourth Amendment's warrant requirement or the exclusionary rule to situations involving "premeditated police intrusions." Even if there were a finding of fact that the F.B.I. Agents believed in good faith that it was lawful without a warrant to break into Diggs' locked box in search of possibly stolen currency—and there is no such finding—the Supreme Court has not validated otherwise unconstitutional invasions of privacy on that basis.

"But 'good faith on the part of the . . officers is not enough.' *Henry v. United States,* 361 U.S. 98, 102 [80 S.Ct. 168, 171, 4 L.Ed.2d 134.] If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate . . .."

*Beck v. Ohio,* 379 U.S. 89, 97, 85 S.Ct. 223, 229, 13 L.Ed.2d 142 (1964).

Moreover, the Agents knew that Rev. Bradley had not been authorized to open the box. And it should have been clear to these Agents, who are trained in the law of search and seizure, that Rev. Bradley had no implied authority to ask or permit them to break into Diggs' and Chris' belongings. It is noted that the Justice Department's *Handbook on the Law of Search and Seizure*[27] states:

"Consent by a person having only limited custody [of personal property belonging to another], such as for storage or shipment, is not valid."[28]

The disputed search here was not conducted under emergency conditions. The

Agents had ample time to consider the matter. No exigencies mandated a hasty judgment. And the Agents could easily have explained to Rev. Bradley, who was not so insistent that he would not "go along," that the proper procedure was to secure a warrant. Under these circumstances and as long as the exclusionary rule is the law, I think it must be applied in this case.

SEITZ, Chief Judge, and JAMES HUNTER, III and GARTH, Circuit Judges, join in this opinion.

---

rejected in *Katz v. United States,* 389 U.S. 347, 351–52, 359, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In any event, *Chapman* does not appear to rest on such a distinction, for the District Court and the Court of Appeals in upholding the search had explicitly relied on the fact "that the property was not used as a residence" or a "private dwelling." *Chapman v. United States,* 272 F.2d 70, 71–72 & n. 1 (5th Cir. 1959). Finally, no one of the reasons discussed in *South Dakota v. Opperman, supra,* note 4 (and cases there cited) for the diminished expectation of privacy in automobiles as opposed to houses is applicable to "a suitcase or a box" which is immobile. See *Coolidge v. New Hampshire,* 403 U.S. 443, 461 n. 18, 463 n. 20, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Cf.*

*United States v. Van Leeuwen,* 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970); *Katz v. United States, supra,* 389 U.S. at 351–52, 88 S.Ct. 507 citing *Rios v. United States,* 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960) and *Ex Parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1877).

**27.** Legislation and Special Projects Section, Criminal Division, Department of Justice, Handbook on the Law of Search and Seizure, Feb. 1971. The Handbook was "designed as a general set of guidelines for personnel performing law enforcement functions" in order "to assist agents" in the field.

