494 S.E.2d 440

**STATE of South Carolina, Respondent,**

v.

**William T. BROCKMAN, Appellant.**

**No. 2752.**

Court of Appeals of South Carolina.

Heard Oct. 8, 1997.

Decided Nov. 17, 1997.

Rehearing Denied Jan. 22, 1998.

---

116

118

Jeffrey Falkner Wilkes, Greenville, for appellant.

Attorney General Charles M. Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Norman Mark Rapoport, Columbia; and Solicitor Joseph J. Watson, Greenville, for respondent.

CURETON, Judge:

William T. Brockman (Brockman) appeals from his convictions for a number of drug offenses.[1] At trial, the state introduced into evidence crack and powder cocaine which Brockman's mother and sister found when they pried open the compartment of Brockman's moped in the presence of Greenville County Sheriff's Deputies. Brockman contends his mother did not have authority to consent to a search of the moped's compartments, and argues the discovery of the drugs cannot be justified as the result of a purely private search. We hold the evidence was improperly admitted.

## I. FACTS

Before trial but after jury selection, the trial court held a hearing on Brockman's motion to suppress introduction of the drugs found within the moped.

Deputy Fitzgerald testified that he and Deputy Crawford were dispatched to a residence on a domestic disturbance call, where they found Brockman's mother, Sharon Peak (Peak), as

---

1. A jury convicted Brockman on two counts of possession with intent to distribute a controlled substance within proximity of a school, playground, or park, and also for trafficking in both cocaine and crack cocaine. Brockman received 30 years in prison and $80,000 in fines.

well as his sister, Audra Brockman (Audra). Fitzgerald stated Peak told the officers that while she refused to allow Brockman to live in the house because he had verbally abused and threatened her, Brockman had repeatedly returned to her house demanding his moped.[2] Fitzgerald recalled that Peak then asked them to remove the moped from her property because she believed Brockman kept drugs there, but they told her they could not take the moped. Since the conversation between the women and the deputies continued to focus on the moped, Fitzgerald eventually asked to see it. Peak led the deputies down to a small laundry room, where, at Peak's request, Fitzgerald helped her pull the moped out of the dark laundry area and into the basement. According to Fitzgerald, Peak again stated the moped contained "dope" and demanded they take it, but Fitzgerald told her: "We can't do that. We don't have any reason to." Peak and Audra then pried open the moped's locked seat compartment, which contained crack, powder cocaine, and cash, as well as a small automatic pistol. The moped's keys were found in Brockman's possession after he was arrested.

Fitzgerald testified neither he nor Crawford encouraged Peak to pry open the moped. However, Fitzgerald admitted that while he knew he did not have probable cause to search the moped, he was aware Peak and Audra were searching the moped for narcotics as he watched. He also admitted Peak and Audra were breaking and entering into moped as he and his partner watched, but he stated "[the women] didn't have any intent to commit a crime."

Deputy Crawford essentially told the same story as Fitzgerald. Crawford added that Peak and Audra were not "real clear" as to why they believed drugs were in the moped. He stated that after he told Peak that the deputies could not take Brockman's moped, Peak asked if she could "go into" the moped. Crawford testified he then told Peak: "Well, that's your business. I'm not here to influence you in any way. If that's what you want to do then that's what you want to do." Crawford noted that once Audra pulled the plastic bag out of the moped, she threw it back into the laundry room. After

2. Peak testified later at trial that Brockman had not lived at her home for over one year prior to the incident.

the deputies asked Peak to retrieve the bag from the laundry room, Crawford noticed her "fumbling around" with the bag while her back was facing them. Peak then handed the deputies the bag with the cocaine, but Crawford subsequently discovered a large amount of cash that Peak had evidently removed from the plastic bag and hidden in a clothes hamper.

Crawford also stated the deputies did not direct the search in any way, and he testified, "I made it clear to [Peak] that we couldn't do anything with the moped, that if she wanted to invite us down there into the living area that we'd be glad to go but we were there only as observers." However, Crawford said they "absolutely" went to the basement to see if Peak was right about the presence of drugs in the moped.

Peak also testified at the suppression hearing, but her story differed slightly from the deputies. She testified she was not worried about drugs being within the moped, but she was concerned about removing the moped from her house so Brockman would stop coming to the house to get it. While she confirmed that the policemen did tell her they could not remove the moped, she stated that one of the officers asked to see the moped while remarking "[Brockman] must want [the moped] for something." In contrast to Fitzgerald's testimony, Peak testified, ". . . [Audra and I] tried to pull [the moped] out [of the laundry room] because [the deputies] wanted to—they said they couldn't see it, to pull it in the light, and that's what we did." As to the discovery of the drugs, Peak further testified:

DEFENSE ATTORNEY: And what did y'all try to do with the butter knife?

PEAK: We tried to open the key lock thing and we couldn't get it so [the deputy] asked me what was in this compartment and, you know—

DEFENSE ATTORNEY: Which compartment would that be?

PEAK: It's the seat, it was, you know, inside of the seat because we couldn't get anything else open.

DEFENSE ATTORNEY: Okay.

PEAK: And so [the deputy] asked us to pull that part and I did and when I pulled it open . . . I grabbed what was in it

and I threw it in the wash room and [the deputies] got the gun.

Finally, Peak testified that she was merely looking for the key so that she could move the heavy moped.

After argument, the trial court denied the motion to suppress, reasoning that Peak was not acting as an agent of the state, that she was merely attempting to remove the moped to protect her premises and prevent further contact with Brockman, and that parents have the right to control the conduct of children who live in their home. The court found the deputies' testimony credible and specifically stated: "I don't think that [Peak's] testimony in any way impugns [the deputies'] credibility."

At trial, Brockman again objected to the admission of the evidence. The trial court also denied Brockman's subsequent motions for a directed verdict and new trial.

## II. STANDARD OF REVIEW

Whether evidence should be suppressed due to a Fourth Amendment violation is a question for the trial court. *State v. Easterling,* 257 S.C. 239, 185 S.E.2d 366 (1971). We defer to the trial court's factual findings and review them only for clear error and lack of evidentiary support, but our review is de novo on the mixed questions of law and fact under a Fourth Amendment analysis. *Cf. Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

## III. THIRD PARTY CONSENT TO SEARCH AND SEIZURE

Brockman first contends that the trial judge erred in ruling that the search was justified because Peak had control over the locked compartments of Brockman's moped as a parent and homeowner. We agree.

We initially assume for the purposes of this issue that the search of the moped was not a private search outside of the constraints of the Fourth Amendment. Thus, we analyze the issue as one of third party consent. Third party consent may validly be given by one who has common authority over or some other sufficient relationship to the premises or

effects searched. *State v. Moultrie,* 271 S.C. 526, 248 S.E.2d 486 (1978) (citing *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)). Common authority does not require common ownership, but merely " 'mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable' for the searching officers to believe that the person granting consent had the authority to do so." *Moultrie,* 271 S.C. at 528, 248 S.E.2d at 487 (quoting *Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7). *See also Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (suppression not warranted if officers had an erroneous but reasonable belief of authority to consent). The prosecution has the burden of satisfying the test. *Matlock,* 415 U.S. at 171–72, 94 S.Ct. at 993–94.

## A. Parental Consent

In applying the principles discussed above, a number of cases from other jurisdictions have held that parents of adult children generally do not have authority to consent to the search of their child's locked bedroom, closet, or compartment to which they do not otherwise have access, even if the locked room or compartment is within the parents' house and the child lives there gratuitously. *See, e.g. United States v. Block,* 590 F.2d 535 (4th Cir.1978) (mother's consent insufficient for search of locked footlocker located in mother's home, where mother told police the footlocker belonged to son and she did not have a key); *United States v. Butler,* 495 F.Supp. 679 (E.D.Ark.1980) (father could not consent to search of bureau drawer and locked suitcase discovered in defendant's room); *State v. Harris,* 642 A.2d 1242 (Del.Super.Ct.1993) (defendant's mother could consent to search of defendant's locked bedroom as she had a key, but could not consent to search of locked toolbox as she did not have a key); *People v. Bliey,* 232 Ill.App.3d 606, 173 Ill.Dec. 856, 597 N.E.2d 830 (1992) (mother could consent to search of defendant's basement room despite his objection, as basement door was not locked and defendant did not instruct mother to keep people out of the bedroom); *Perry v. State,* 538 N.E.2d 950 (Ind.1989) (consent by mother was valid as evidence showed she frequently cleaned son's unlocked room and thus had equal access); *Becknell v. State,* 720 S.W.2d 526 (Tex.Crim.App.1986) (defendant's father could

not consent to search of locked bedroom because defendant cooked and ate apart from the rest of the family, father did not have a key to room, and father did not enter room unless defendant was present).

Admittedly, a few South Carolina cases have affirmed the introduction of evidence discovered in a search of a guest's or adult child's room based on consent of the homeowner or parent, but, unlike the cases from the jurisdictions cited above, those cases do not state that only the guest or child had access to the area or item searched. *State v. Pressley*, 288 S.C. 128, 341 S.E.2d 626 (1986) (homeowner could consent to search of area occupied by guest); *State v. Moultrie*, 271 S.C. 526, 248 S.E.2d 486 (1978) (in a case where defendant was living rent-free with a homeowner's daughter, the homeowner could validly consent to search of the defendant's room);[3] *State v. Middleton*, 266 S.C. 251, 222 S.E.2d 763 (1976) (father could consent to search of son's bedroom where father occupied and provided the apartment), *vacated on other grounds*, 429 U.S. 807, 97 S.Ct. 44, 50 L.Ed.2d 69 (1976); *State v. Miller*, 260 S.C. 1, 193 S.E.2d 802 (1972) (mother could consent to police seizure of articles of clothing from defendant's room).

In any event, Brockman did not actually live at Peak's home when the search occurred, and thus unlike all of the above cited cases, the locked container here essentially was in Peak's possession as a gratuitous bailee. *Cf. State v. Curley*, 253 S.C. 513, 171 S.E.2d 699, *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970); 8 Am.Jur.2d *Bailments* § 294 (1980).

## B. Bailee Consent

We are thus faced with the issue of the right of bailees to consent to a search of locked containers in their possession. The state challenges Brockman's Fourth Amendment standing by arguing he did not have a reasonable expectation of privacy

---

**3.** *Moultrie* noted, "while we do not adopt a rigid rule to be applied in every case, we believe the police should be allowed to rely on the consent of the owner and on the general appearances of the situation." 271 S.C. at 529, 248 S.E.2d at 488. Obviously, the fact that the police would have to break a lock to access the area to which there was supposedly consent to search would weigh heavily against a reasonable belief of common authority in most situations.

in the moped he left at Peak's house. Although we disagree with the state, we first note our general agreement with the following:

> [T]he right of the custodian of the defendant's property who has been unwittingly involved by the defendant in his crime to exculpate himself promptly and voluntarily by disclosing the property and explaining his connection with it to government agents, must prevail over any claim of the defendant to have the privacy of his property maintained against a warrantless search by such agents.

*United States v. Diggs*, 544 F.2d 116, 120–21 (3rd Cir.1976) (en banc). *See also United States v. Botsch*, 364 F.2d 542 (2nd Cir.1966). However, since Fourth Amendment determinations are heavily fact-specific and made on a case-by-case basis, a review of the facts in various "bailee consent" cases is helpful. In *Botsch*, Botsch was fraudulently procuring merchandise using the credit and name of another. Botsch rented a "shanty" from Stein, whom Botsch allowed to retain a key so that Stein could accept merchandise delivered for storage. After investigators visited Stein, he became concerned his property was being used for illegality and allowed them to enter the shanty. *Botsch*, 364 F.2d at 544–46. The court upheld the warrantless search, noted that Stein had a key and permission to use it, and thus concluded:

> Stein, having been made an unwitting accomplice by Botsch, had a vital interest in cooperating with the Inspectors so that he could remove any taint of suspicion cast upon him. Indeed, any individual under similar circumstances would have a right to promptly and voluntarily exculpate himself by establishing that his role in the alleged scheme was entirely innocent and passive.

*Id.* at 547.

Next, in *Curley*, 253 S.C. 513, 171 S.E.2d 699 (1970), the defendant's friend, who customarily drove a car registered to the defendant, loaned the car in the defendant's presence to a second friend. The second friend consented to a search of the trunk after being stopped by police. The court stated, "by allowing another to use his car and, without prohibitory instructions entrusting her with the key to the trunk, [the defendant] must be taken to have assumed the risk that she

would accede to the request of an officer to look inside." *Id.* at 518, 171 S.E.2d at 701.

Similarly, in *United States v. Gradowski,* 502 F.2d 563 (2nd Cir.1974), the defendant left his car and its keys with his friend's sister at her and her husband's house. The court affirmed the warrantless search of the car's trunk based on consent of the homeowners, and noted that they had both access to the trunk as well as "[either express or implied] permission to exercise that access." *Id.* at 564.

In *Diggs,* the defendant and his wife asked the wife's uncle to keep a locked box, but they did not leave the uncle a key to the box. A few days later, the uncle's sister told him that the defendant had been arrested for armed robbery, and the uncle telephoned the defendant's wife. During an "evasive" conversation, the wife informed the uncle that she specifically told the FBI that her husband had not left anything at the uncle's house during their recent visit, and she asked the uncle to lie to the FBI and deny he was holding the lockbox. The uncle became concerned he was holding stolen property, and contacted FBI agents who jointly searched the box with him. *Diggs,* 544 F.2d at 117–19. Five judges of the en banc panel would have reversed the district judge's suppression of the evidence, but reluctantly concurred in a remand in order to avoid affirmance. *Id.* at 122–23. Applying the *Botsch* rule, four of these judges noted, "it taxes credulity to label as an unreasonable search and seizure the action of FBI agents in responding to the urgent request of an innocent but compromised individual for aid in exculpating himself." *Diggs,* 544 F.2d at 121. The four judges would have held that Diggs placed the uncle in a "sufficient relationship" to consent to the search, and thus "assumed the risk" of search, by involving the uncle in the crime through delivery to him of the stolen money for safekeeping. *Id.* at 121–22. Judge Gibbons, who held the swing vote which led to a remand, agreed that the uncle could deliver the box to the FBI, but rejected the notion that the uncle could consent to a search of the box, because he did not have a key and thus entry was outside "the scope of [the uncle's] authority under the terms of the bailment." *Id.* at 124–25. Judge Gibbons believed that such a search possibly could be justified as an inventory search of seized property, as long as the search was not a pretext for investigation, so

he concurred in a remand for further findings. *Id.* at 126–27. A vigorous dissent by four judges noted that the record reflected the uncle was not concerned about implication in the crime, and stated that a bailee's preference for an immediate search was insufficient to ignore the warrant requirement. *Diggs,* 544 F.2d at 127–29.

In *Gieffels v. State,* 590 P.2d 55 (Alaska 1979), Gieffels, who was wanted for murder and robbery, called his brother and asked him to pick up a suitcase using a baggage claim check Gieffels had left with a bartender. The brother knew the police, who had already contacted him, were watching his house in case Gieffels appeared. The brother thus called the police and told them he did not care if they took the suitcase. The police retrieved the suitcase, and later, with a warrant, opened and searched it. The court, although noting the factual differences from *Diggs,* ruled that the brother had authority to consent to the seizure of the suitcase "to avoid any possible involvement in the crime." *Gieffels,* 590 P.2d at 60–62. However, the court stated that its holding "does not extend to [the brother's] authority to authorize a search of the suitcase," but did not address that issue because the police search was performed pursuant to a warrant. 590 P.2d at 62–63.

Other analogous cases have rejected the idea that officers had a reasonable belief of authority to consent where the third party neither claimed nor actually had permitted access to the thing or area searched. *See, e.g. United States v. Presler,* 610 F.2d 1206 (4th Cir.1979) (holding that defendant had an expectation of privacy in locked suitcases left with a friend, and that the friend's consent to search was not valid as the defendant did not give his friend either a key or the combination to the locks, nor did the friend claim to the officers a right of mutual access); *State v. Stewart,* 203 Ga.App. 829, 418 S.E.2d 110 (1992) (police could not have a reasonable belief of authority to consent in a person who rented a warehouse for a friend but did not have a key or other means of access).

■ In general accord with many of the authorities discussed above, we hold that, while a bailee may consent to police seizure of a defendant's locked container, officers generally cannot have a reasonable belief of a bailee's authority to

consent to a search of the locked container, if the bailee does not have a key and there is no other evidence of common authority and mutual access.[4] *Cf. State v. Bailey,* 276 S.C. 32, 274 S.E.2d 913 (1981) (officers had reasonable belief of resident's authority to consent to search of truck parked behind residence, because unlocked truck was left on premises without instructions as to its use, and keys were within the cab).

In the present case, we primarily rely, as the trial court did, on the deputies' testimony, and hold Peak could not validly consent to a search of the moped's locked compartments. First, Brockman obviously had a legitimate expectation of privacy in compartments which he locked and retained the only key.[5] We see no distinction between the locked compartment of a moped and a lockbox, other than a warrantless search of the former could be potentially justified by a showing of probable cause in circumstances sufficient for application of the "automobile exception." Second, the deputies refused Peak's request that they seize the moped, because Peak was not "real clear" on the basis for her suspicions, and the deputies knew and freely admitted they had no probable cause to secure a warrant. Third, Peak told the officers the moped belonged to Brockman. The officers also knew Peak neither claimed nor actually had access to the locked compartments. Thus, we cannot justify this search by concluding that the deputies had a reasonable belief of Peak's authority to consent to a search of the moped's compartments.

## IV. PRIVATE SEARCH

Brockman next contends the trial court erred in ruling the search private because the evidence shows it was conducted with the advice, consent and participation of the deputies. We agree the search was not private.

---

4. Of course, we do not adopt a rigid rule with this statement, as all Fourth Amendment determinations depend heavily on the individual facts and circumstances in each case.

5. We reject the state's argument that Brockman did not have a legitimate expectation of privacy because he "abandoned" the moped in Peak's home. In fact, Brockman was at Peak's house demanding return of the moped shortly before Peak summoned the deputies.

 While the Fourth Amendment does not bar evidence discovered during a search and seizure conducted by a private party, it does bar such evidence if the private-party acted as an instrument or agent of the government. *State v. Cohen*, 305 S.C. 432, 409 S.E.2d 383 (1991) (citing *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)). A court should consider the totality of the circumstances, as well as the following factors when determining if a private citizen's search or seizure constituted government action: (1) the degree of governmental instigation, participation, or acquiescence in the citizen's search, (2) the citizen's motivation, whether to further law enforcement efforts, or to further his own ends, and (3) the legality of the conduct encouraged by the police. *Cohen*, 305 S.C. at 435–36, 409 S.E.2d at 385–86. The defendant has the burden of showing "sufficient government involvement in the private citizen's conduct to warrant fourth amendment scrutiny." *Id.* at 434, 409 S.E.2d at 385.

We begin again by reviewing the factual situations in other Fourth Amendment cases involving private searches. In *Cohen*, a policeman asked that a certain UPS employee call him as he suspected certain UPS packages contained illegal drugs. UPS superiors then told the employee to call them if another package arrived for delivery to the defendant. After the employee did so, the supervisor examined the box and thought the items within were broken. Pursuant to company policy, the supervisor opened the box and found crack cocaine. Our Supreme Court held that since UPS directed its employee to call his superiors and not the police, and knew from that employee that an unusual amount of packages were going to the defendant, UPS was motivated not to assist police but by a concern that it was delivering contraband. The court found the policeman's request for a phone call was insufficient government involvement and did not request an illegal act. Thus, the court affirmed the introduction of the evidence. 305 S.C. at 433–37, 409 S.E.2d at 383–86.

In *Peters v. State*, 302 S.C. 59, 393 S.E.2d 387 (1990) (post-conviction relief action), the court held that a woman's subsequent seizure of LSD at the request of police, after the woman initially discovered the evidence while visiting, was not an impermissible warrantless governmental search, as the subse-

quent governmental search did not exceed the scope of the initial private one.

In *State v. McSwain*, 292 S.C. 206, 355 S.E.2d 540 (1987), the court reversed suppression of arson evidence gathered by a fire analyst solely at the behest of the defendant's insurer. The court noted, "the record indicates no government participation whatsoever." *Id.*

Many opinions from other jurisdictions have addressed this area of Fourth Amendment jurisprudence. *See* Christopher Bello, *Search and Seizure: Necessity that Police Obtain Warrant Before Taking Possession of, Examining, or Testing Evidence Discovered in Search by Private Person,* 47 A.L.R.4th 501 (1986). Some cases have suppressed evidence gathered from private searches which took place while police were present. *See, e.g. United States v. Reed,* 15 F.3d 928 (9th Cir.1994) (search of room by hotel clerk, who telephoned police upon suspecting guest was selling narcotics, was a governmental search where police accompanied clerk to the room for safety but waited outside, because police (1) knew of and acquiesced in search, and (2) clerk's motive was to assist in narcotics investigation); *State v. Abdouch,* 230 Neb. 929, 434 N.W.2d 317 (1989) (search invalidated because officers were present while deceased's family searched another's house for possessions of deceased, despite lack of any authority to enter the house).

On the other hand, a number of cases have sanctioned evidence as the result of a purely private search even though the search was conducted while police or government agents were present. *See, e.g. United States v. Kennedy,* 61 F.3d 494 (6th Cir.1995) (cocaine in misrouted suitcase would have been inevitably discovered in airline's search for identification, even though police were present during search); *United States v. Andrini,* 685 F.2d 1094 (9th Cir.1982) (although officer was nearby during hotel clerk's search of bag, search was conducted pursuant to hotel policy, as bag was misplaced and had no exterior identification); *United States v. Lamar,* 545 F.2d 488 (5th Cir.1977) (although detective approached airline employee and said he was interested in an unclaimed bag, and then watched the employee's search, bag had already been set aside for identification search pursuant to normal procedure); *Unit-*

*ed States v. Entringer*, 532 F.2d 634 (8th Cir.1976) (although FBI agent was present, clerk was merely following airline policy by opening packages, because items apparently had been stolen from the packages during shipment).

In many of the cases upholding a private search while the police were present to some greater or lesser degree, the citizen followed some sort of company policy or had some other legitimate justification for conducting the search. *See, e.g. United States v. Jennings*, 653 F.2d 107 (4th Cir.1981) (noting that "a search of a suspicious package by an agent of an airline is not unlawful"), *cited in Cohen*, 305 S.C. at 435, 409 S.E.2d at 385; *People in Interest of P.E.A.*, 754 P.2d 382 (Colo.1988) (although principal received tip from officer, school policy was to search student, locker, and car parked on school grounds if the school received any sort of tip about illegal drugs), *cited in Cohen*, 305 S.C. at 436, 409 S.E.2d at 385.

We now move to application of *Cohen*'s factors to the record before us. Relying, as the trial court did, on the officers' testimony, the police certainly knew of and acquiesced in Peak and Audra's search of the moped. Fitzgerald stated he asked to see the moped before Peak suggested she search it for drugs. The deputies informed Peak they would be willing to observe the search for drugs after telling her: "If [searching is] what you want to do then that's what you want to do." On the other hand, we note that we would not find participation, without more, simply because the deputy politely helped Peak move the heavy moped into a lighted area.[6]

Next, we review the "citizen's motivation" in conducting the search. The deputies' testimony was that Peak and Audra were searching the moped for "dope," ostensibly to give the deputies reason to seize the moped due to their prior refusal to take it. Admittedly, Peak testified that she broke into the moped in order to find keys to enable her to move it,[7] but we defer to the trial judge's primary reliance on the deputies'

---

**6.** Peak testified to conduct by the deputies which we would find to be participation, such as directing the searcher to pry open a particular compartment. However, we rely, as the trial court did, on the testimony of the deputies.

**7.** We fail to see how the finding of keys would have facilitated the removal of the moped by the police, inasmuch as the officers had no

testimony. Moreover, the whole impetus to the disagreement which led the summoning of the deputies was Peak's refusal to give the moped to Brockman, which conflicts with a conclusion that her primary motivation in breaking into the moped was simply to remove it from her property.

In any event, with regard to the "legality of conduct encouraged by the police," the deputies here certainly acquiesced, and in fact watched, while Peak and Audra broke into a locked compartment in which the deputies knew the women had neither permitted access nor ownership. Therefore, two deputies watched the women engage in conduct which was potentially criminal.[8] We recognize that even a private search which may amount to a crime will not ordinarily prevent admission of the fruits of that search. *State v. Sanders*, 327 N.C. 319, 395 S.E.2d 412 (1990), *cited in Cohen*, 305 S.C. at 434, 409 S.E.2d at 384. However, we must conclude that the officers here could not tacitly authorize and watch an arguably illegal search, and then attempt to justify it as purely private. *Cf. People v. McKinnon*, 7 Cal.3d 899, 103

---

authority to seize it absent cause to believe it contained contraband or evidence of a crime.

8. Of course, our purpose here is not to address Peak and Audra's commission of any crime. However, we note that S.C.Code § 16–21–90 (1985) provides: "A person who, with intent and without right to do so, damages a vehicle or damages or removes any of its parts or components is guilty of a misdemeanor." For purposes of § 16–21–90, "vehicle" and "moped" are defined in S.C.Code Ann. § 56–19–10 (Supp.1996), and we believe a moped is a vehicle pursuant to those definitions. *Accord State v. Singleton*, 319 S.C. 312, 460 S.E.2d 573 (1995) (mopeds and the driving under the influence statute); 1986 Op. Att'y Gen. 28. Moreover, as we have held, Peak and Audra had no right to enter the moped, and we believe we can safely assume that prying open a locked compartment with a tool probably results in damage to a moped. With respect to intent, one who pries open a moped's compartment to get to its contents at least acts knowingly in damaging the moped, even though the intended result is access, and not damage. *Cf. United States v. Bailey*, 444 U.S. 394, 404, 100 S.Ct. 624, 632, 62 L.Ed.2d 575 (1980) (stating, "in the case of most crimes, the limited distinction between knowledge and purpose has not been considered important since there is good reason for imposing liability whether the defendant desired or merely knew of the practical certainty of the result[s]"), *quoted in* McAninch & Fairey, *The Criminal Law of South Carolina* 5 (3d ed. 1996). Thus, the women arguably violated § 16–21–90 in the presence of the deputies.

Cal.Rptr. 897, 906, 500 P.2d 1097, 1106 (1972) (stating that "in appropriate circumstances a private citizen may also be deemed to act as an agent of the police when the latter merely 'stand silently by,' i.e., when they knowingly permit the citizen to conduct an illegal search for their benefit and make no effort to protect the rights of the person being searched"), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1891, 36 L.Ed.2d 390 (1973); *Moody v. United States,* 163 A.2d 337, 340 (D.C.Mun. App.1960) (noting that "we cannot characterize [an officer] as a willing but innocent beneficiary in standing silently by while the appropriation was taking place"); *State v. Bohannon,* 3 Kan.App.2d 448, 596 P.2d 190, 196 (1979) (noting that "while [the officer] did not instruct [the citizen] to take any illegal action, the record contains evidence from which the trial court could conclude that he must have been aware of the probability such activity would take place"); *State v. Abdouch,* 230 Neb. 929, 434 N.W.2d 317, 325 (1989) (invalidating a search despite claims that it was private, and reasoning, in part, that "none of the group, comprised of the Clark family and the officers, had a claim to enter, or a legal status, greater or stronger than a stranger's"); *Commonwealth v. Borecky,* 277 Pa.Super. 244, 419 A.2d 753, 757 (1980) (invalidating warrant supported by informant's illegal search, despite lack of police initiation or instruction, because "the state trooper's admitted prior knowledge of the warrantless search, and acquiescence therein, was sufficient to constitute ratification of the informant's illegal activity on behalf of the Commonwealth"). *Cf. Sanders,* 327 N.C. 319, 395 S.E.2d 412 (upholding search, and reasoning, in part, that no police officers encouraged or knew beforehand that citizen was going to lie to defendant's sister in order to search defendant's room for evidence), *cited in Cohen,* 305 S.C. at 436, 409 S.E.2d at 385. A police officer's obligation is to prevent, and certainly counsel against, the potential commission of a crime. S.C.Code Ann. § 23–13–70 (Rev.1989) (Deputy Sheriffs "shall use every means to prevent or detect, arrest and prosecute for ... the violation of every law which is detrimental to the peace, good order, and morals of the community.").

## V. CONCLUSION

We hold that the deputies could not have had a reasonable belief that Peak had authority to consent to a search of the

moped's locked compartments. We further hold that the search cannot be justified as a purely private search outside the purview of the Fourth Amendment. Appellate courts do not relish reversing the convictions of obviously guilty defendants. The fact that a large quantity of drugs ultimately was found within the moped is irrelevant to the examination of the issues before us. We have no choice but to suppress the evidence found within the moped and hold that Brockman's case be

REVERSED AND REMANDED.

GOOLSBY and CONNOR, JJ., concur.