534 S.E.2d 10

**The STATE, Appellant,**

**v.**

**Florence Robinson EVANS, Respondent.**

No. 3187.

Court of Appeals of South Carolina.

Heard Dec. 9, 1999.

Decided June 12, 2000.

Rehearing Denied Sept. 2, 2000.

---

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney Generals Donald J. Zelenka and David K. Avant, and Assis-

tant Attorney General S. Creighton Waters, all of Columbia, for appellant.

Senior Assistant Appellate Defender Wanda H. Haile, of SC Office of Appellate Defense, of Columbia, for respondent.

CURETON, Judge:

A Chesterfield County grand jury indicted Florence Robinson Evans for the murder of her three children.[1] At a pretrial hearing, the trial court suppressed Evans's oral and written confessions. The State appeals. We affirm.

## FACTS

On the morning of March 4, 1994, a fire destroyed the Pageland trailer-home of Evans and killed her three small children. Evans survived as she was visiting her sister's nearby home at the time of the fire. Later that day, arson investigator Terry Alexander of the South Carolina Law Enforcement Division (SLED) obtained Evans's permission to search the burned-out trailer, but she refused to give Alexander a written statement. An initial test of the site revealed the presence of a flammable substance in the debris. Samples were collected for later analysis at SLED's laboratory to determine the type of accelerant present at the commencement of the fire.

Agent Alexander did not return to Pageland until after the children's funerals. Around lunchtime on March 14, 1994, he attempted to contact Evans at the home of her cousin where she had been staying since the fire, but Evans was not there. He left word with an occupant of the house to ask Evans to "come to the Pageland Police Department for the purposes [sic] of talking to me about the fire." Between 3:00 and 4:00 p.m., Evans's cousin, Inez Robinson, drove Evans to Pageland's police station.[2] Alexander and his supervisor, SLED

---

1. Throughout the record, the defendant is referred to as both Florence Evans and Florence Robinson. For the sake of clarity, Evans is used exclusively in this opinion.

2. Inez Robinson is married to Evans's first cousin; she raised Evans and her siblings after their mother died. At the hearing, Robinson

Lieutenant Doug Ross, escorted Evans back to a detective's office in the station which they had borrowed to conduct the interview. Robinson and several other family members who had accompanied Evans to the station were left in the station's waiting room. Robinson asked if she could accompany Evans because "she's quiet," and Robinson wanted to be with her, but the officers refused.

Once inside the small detective's office, Evans agreed to talk with Agent Alexander and Lt. Ross. She told them that on the morning of the fire, she arose just before 9:00 a.m., lit a kerosene heater, then left her children asleep in the trailer while she went next door to visit her sister. Minutes after her arrival, Evans's sister said she smelled smoke, so Evans looked out the window and saw her trailer in flames. Evans testified that she rushed back to the trailer and attempted to gain entry, but was barred by the flames. When asked what caused the fire, Evans opined that it could have been caused by either dogs under the trailer, her sister's son playing with matches, or a faulty electrical outlet. During the interview, Alexander took notes on a "Voluntary Statement" form, but he neither asked Evans to read the form nor advised her of the *Miranda*[3] rights contained thereon.

Agent Alexander testified that although Evans was "very cooperative" during the interview, she was also upset and sobbing. At times, Evans would speak so softly that Alexander could barely understand her. She would also clutch the agent's hands and ask him for help. Although Alexander repeatedly asked her what type of help she required, Evans never responded with a specific request. Alexander testified that he felt the interview was very unproductive and tried to end it on several occasions, but claimed that Evans would respond with tears and repeat her request for help.

Lieutenant Ross confirmed Alexander's account of the interview. He testified that "the interview seemed to be—you know—basically no help at all" and "was a very long drawn

---

testified she took Evans to the police station after Evans told her "the law" was looking for her.

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

out event" which lasted two or three hours. Ross also claims to have been unsuccessful in ending the interview.

After more than an hour of questioning, the two agents stepped into the hall outside the interview room to confer about Evans's statement. Ross testified that he suggested to agent Jennifer Edwards of SLED's child fatality unit to "go in and talk to [Evans], see if [Edwards] could—you know—get anything different than we already had." Edwards testified she spent "approximately 45 minutes to an hour" alone with Evans trying to comfort her. Edwards maintains she was just "having a conversation" with Evans the whole time and "was not on a fact-finding mission." On at least one occasion, Edwards escorted Evans to the bathroom and "stood outside the door" because, according to her, she thought Evans may try to harm herself. When they returned to the interview room, Evans continued to plead for help. Edwards responded: "Florence, I don't know what kind of help you need until you tell me." Evans then whispered, "I dropped a lit piece of paper on the floor. . . . I walked next door and waited until somebody saw the fire." Edwards immediately summoned Ross and asked Evans to repeat what she had said. Evans complied. Ross called in Alexander and Evans again repeated the statement. As a result, Alexander added another paragraph to his notes on the Voluntary Statement form:

> I dropped a lit piece of paper on the floor. I rolled it up and lit it. It was writing paper. I dropped the paper on a rug. The rug caught on fire and I went out the front door. I went next door to my sisters [sic] house and just waited. I waited about two hours until someone saw the fire. I got some kerosene in a cup and poured it on the rug. The fire got bigger and as I left it was burning a lot [sic]. I was hurting inside about seeing people do people wrong. Please get me some help. Please get me some help. I lit the fire with a match. I don't remember who found the fire. I got the kerosene out of the blue jug and put it back on the porch.

The interview ended at 6:01 p.m. Alexander read his notes back to Evans and she subsequently signed and initialed the "Voluntary Statement." As a result, the officers immediately placed her under arrest.

Evans testified that during the interview, she repeatedly asked to speak with her cousin, Inez Robinson. She also admitted to asking the agents for help. Evans does not deny signing the voluntary statement, but claims she thought she "was signing some [sic] papers to get me some [sic] help."

Robinson also attempted to speak with Evans during the interview, but was restricted to the station's waiting room until after Evans's arrest. Robinson testified that "[w]hen [Evans] saw me, she just run [sic] to me and held me. She said she told them she wanted to get to me. . . . She kept crying out to see me. They would not let her see me." According to Robinson, Evans was "real shaky" and "upset, like if someone had scolded her." She said Evans told her "[t]here was some kind of paper they wanted her to sign," and Evans then declared, "Inez, I did not kill my babies." Robinson stated she had "never seen [Florence] look like that" and reported that Evans told her the officers "pushed her to sign some papers."

A Chesterfield County grand jury indicted Evans on three counts of murder on April 13, 1994. On May 1–4, 1998 the trial court held a *Jackson v. Denno*[4] hearing to discuss the admissibility of Evans's oral and written statements of March 14, 1994. The trial court suppressed her oral and written statements to the police pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This appeal followed.

## LAW/ANALYSIS

■ Our review of a trial court's ruling that a person was "in custody" for *Miranda* purposes "is limited to a determination of whether the ruling by the trial court is supported by the testimony." *State v. Easler*, 322 S.C. 333, 342, 471 S.E.2d 745, 751 (Ct.App.1996) (citing *State v. Primus*, 312 S.C. 256, 440 S.E.2d 128 (1994)), *modified on other grounds*, 327 S.C. 121, 489 S.E.2d 617 (1997). In the instant action, the State invites us to adopt a new standard and conduct a *de novo* review of the "mixed question of law and fact" pursuant to *Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d

---

**4.** *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

383 (1995). As our Supreme Court has recently rejected a similar *de novo* standard promulgated by the United States Supreme Court in *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), we must reject the State's invitation.

In *Keohane,* the Supreme Court resolved a dispute among the Federal Courts of Appeals concerning the proper standard of review in federal habeas corpus proceedings. The Court held that "state-court 'in custody' determinations" are not entitled to "a presumption of correctness under 28 U.S.C. § 2254(d)," and that the determination of "whether a suspect is 'in custody,' and therefore entitled to *Miranda* warnings, presents a mixed question of law and fact qualifying for independent review." *Id.* at 102, 106, 116 S.Ct. 457. In reaching its holding, the Court traced the evolution of federal habeas corpus review and differentiated between "basic, primary, or historical facts" and "subsidiary factual questions." *Id.* at 110, 116 S.Ct. 457. After acknowledging that it has " 'not charted an entirely clear course in this area[,]' " the Court espoused its new theory concerning the "ultimate 'in custody' determination for Miranda purposes...." *Id.* at 110, 112, 116 S.Ct. 457 (quoting *Miller v. Fenton,* 474 U.S. 104, 113, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)).

Shortly after deciding *Keohane,* the Supreme Court resolved a similar conflict among the Federal Courts of Appeals concerning the proper standard of review for warrantless searches in federal criminal proceedings. In *Ornelas v. United States,* 517 U.S. 690, 691, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), the Court held that "the ultimate questions of reasonable suspicion and probable cause to make a warrantless search should be reviewed de novo." This Court applied the *Ornelas* de novo standard of review in *State v. Brockman,* 329 S.C. 115, 494 S.E.2d 440 (Ct.App.1997), but was reversed by our supreme court which held that it was not bound by *Ornelas* even though many other states had adopted it. *State v. Brockman,* 339 S.C. 57, 528 S.E.2d 661 (2000) (reversing *State v. Brockman,* 329 S.C. 115, 494 S.E.2d 440 (Ct.App. 1997)). "*Ornelas* was merely a supervisory opinion crafted out of [the United States Supreme] Court's policy concerns, and it in no way clarifies our standard of review in the instant case." *Brockman,* 329 S.C. at 121, 494 S.E.2d at 443. Our

supreme court also noted that at least one other state had also concluded that *Ornelas* was merely a supervisory opinion and not binding upon state courts. *Id.* at 121, 494 S.E.2d at 443.

*Keohane* articulates a standard of review for the specific context of a federal habeas corpus proceeding and in no way suggests that the Court is articulating a new standard of review for all Fifth Amendment issues.[5] *Keohane*'s holding is much more limited in scope than that which our supreme court rejected in *Ornelas* because *Keohane* focused upon the unique forum of federal habeas corpus, whereas *Ornelas* reviewed a federal criminal proceeding, one of the supreme court's traditional forums for promulgating new ·rules of criminal law. Given that our supreme court has rejected the relatively broader *Ornelas* opinion, it is doubtful it would adopt the much narrower *Keohane* standard. Accordingly, the deferential standard of *Easler* is still the appropriate standard of review.

In *Miranda,* the Supreme Court examined various interrogation techniques utilized by police during station-house interrogations and concluded many of those techniques amounted to psychological ploys aimed at eliciting involuntary confessions from suspects. To protect an accused's Fifth Amendment right against such involuntary self-incrimination, the Court fashioned the now familiar *Miranda* warnings which are triggered whenever a person is "subjected to interrogation" while in "custody." *Id.* at 467–468, 86 S.Ct. 1602. The *Miranda* Court first described a "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. 1602.

In *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), the Court applied *Miranda* to the stationhouse interview of a suspect who had *voluntarily agreed to the interview* and met the police at the station for that purpose. The Court held such an interview did not amount to "custody" for purposes of *Miranda* because "there is *no indication* that the questioning took place in a context where respondent's

---

**5.** The Fifth Circuit reached the same conclusion in *United States v. Tompkins,* 130 F.3d 117 (5th Cir.1997).

freedom to depart was restricted in any way.... At the close of a ½–hour interview respondent did in fact leave the police station...." *Id.* at 495, 86 S.Ct. 1602.

In *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), the Court reaffirmed *Mathiason* and rejected the California Court of Appeal's "totality of circumstances" analysis of custody determinations. "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' *of the degree associated with a formal arrest.*" *Id.* at 1125, 103 S.Ct. 3517 (quoting *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711) (emphasis added).

■ In the intervening years since *Beheler*, several state courts have promulgated criteria for determining whether what was initially a voluntary station-house interview becomes a custodial interrogation for *Miranda* purposes. In *Stansbury v. California*, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994), the Supreme Court reviewed California's criteria in a case where a suspect in a child homicide voluntarily accompanied police to their station for an interview. The Court neither endorsed nor rejected California's approach, but held that while "a court must examine all of the circumstances surrounding the interrogation, ... 'the *ultimate inquiry* is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" 511 U.S. at 322, 114 S.Ct. 1526 (quoting *Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517) (second alteration in original) (emphasis added).

■ Therefore, the ultimate inquiry in the instant action is whether the interview of Evans so restrained her freedom of movement as to be the functional equivalent of a formal arrest.[6] ‒

---

6. The restraints on Evans's freedom of movement must be measured by an objective standard. *State v. Easler*, 327 S.C. 121, 128, 489 S.E.2d 617, 621 (1997) ("The initial determination of whether an individual was in custody depends on the objective circumstances of the interrogation, not the subjective views harbored by either the interrogating officers or the person being questioned.").

Applying an objective standard, the trial judge concluded Evans's interview rose above the level of a "routine inquiry" to that of *Miranda*'s custodial interrogation. The record supports a conclusion that during the interview, Evans experienced restrictions on her freedom of movement which are consistent with a formal arrest. First, she was separated from family members and not allowed any contact with them during the interview. Secondly, she was not allowed to leave the interview room alone to care for any of her personal needs during this long and emotional interview. If she needed water or a tissue, it was brought to her in the interview room. When she had to use the bathroom, she was escorted by an agent even though the bathroom was only across the hall from the interview room. Thirdly, Evans's pleas for help were ignored and the interview continued despite the ready availability of Evans's family members who were the logical source of solace for a grieving victim of a crime where law enforcement, by its own admission, did not know what type of help she required. Lastly, the fulfillment of the ostensible purpose of the informational interview—a statement concerning the fire—did not terminate Evans's encounter with law enforcement. The interview continued for three hours, during which time the officers continually questioned Evans's speculations concerning the origin of the fire. When viewed in its totality, Evans's treatment was consistent with a formal arrest.

**AFFIRMED.**

HUFF, J., concurs and HOWARD, J., dissents in separate opinion.

HOWARD, Judge (dissenting):

I respectfully disagree with the majority's conclusion that the evidence supports the trial judge's ruling. I conclude the evidence clearly demonstrates, from an objective viewpoint, that the defendant's freedom of movement was not so restrained as to be the functional equivalent of a formal arrest. *See State v. Easler,* 327 S.C. 121, 489 S.E.2d 617 (1997); *Stansbury v. California,* 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994).

The defendant voluntarily came to the police station. The length of the ensuing interview is of no significance in deter-

mining custodial status, because the officers continually attempted to terminate it and send her home. It was the defendant's conduct which prolonged the interview. Nothing was communicated to the defendant which would indicate she was not free to leave. In fact, even after confessing to the crime, the defendant undeniably demonstrated that she did not believe she was under arrest. She picked up her belongings, said goodbye, and attempted to leave, claiming she needed to go to church. She clearly did not believe she was in custody.

Although the trial court articulated the appropriate objective standard, I believe the circumstances were weighed under a subjective standard, viewing them from the perspective of the defendant's mental handicap. This was legal error. *See Stansbury*, 511 U.S. at 323, 114 S.Ct. 1526 ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."). In my opinion, the evidence is susceptible to only one reasonable conclusion, and that is that the oral confession was the product of a non-custodial interview. At least as to the initial confession, I would rule that the trial court erred in excluding it, and would reverse and remand for further consideration of the second, oral confession and the written confession.